[S.F. No. 23929. Nov. 5, 1979.]

MICHAEL M. Petitioner, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Gregory F. Jilka and Teresa de la O for Petitioner.

Marteen J. Miller, Public Defender (Sonoma), and Lynn S. Young, Deputy Public Defender, as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, William R. Pounders and Sandy R. Kriegler, Deputy Attorneys General, for Real Party in Interest.

OPINION

**RICHARDSON, J.**—We consider the constitutionality of Penal Code section 261.5 (all statutory references are to that code unless otherwise cited), which defines the offense of "unlawful sexual intercourse" as "an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female is under the age of 18 years." The crime was formerly called "statutory rape." ■■■ We will conclude that while this section does classify both victims and offenders by sex, there is a compelling state interest which justifies the classifications, thus meeting the equal protection requirements of both federal and state Constitutions.

The factual and procedural aspects of the case are briefly described. Defendant, 17½ years old, and Sharon, 16, engaged in sexual intercourse after an amorous interlude on a park bench. There was some evidence that the defendant struck Sharon twice before she engaged in the act. After the juvenile court found that defendant was not a fit and proper subject to be dealt with under the juvenile court law (Welf. & Inst. Code, § 707, subd. (a)), he was charged by information with a felony violation of section 261.5. Following his unsuccessful motion to set aside the information under section 995, he seeks from us a writ of prohibition to compel the respondent superior court to dismiss the information on the ground that section 261.5 violates the equal protection clauses of both the United States and California Constitutions, because only females are protected by the statute and only males may be prosecuted under it. (§ 999a; (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420, 427-428 [134 Cal.Rptr. 650, 556 P.2d 1101].) For reasons developed below we reject this contention.

In *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], we considered the issue of suspect classifications based upon sex. Specifically, we there invalidated a statute which prohibited women from tending bar except in certain limited circumstances. Under the strict scrutiny standard routinely applied when the classification is deemed suspect, we imposed upon the state the burden of establishing not only that the state has a *compelling* interest which justifies the law but that those distinctions drawn by the law are necessary to further the statute's purpose. (*Id.*, at pp. 16-17; *Arp v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 406 [138 Cal.Rptr. 293, 563 P.2d 849]; *Westbrook v. Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

There can be no doubt that section 261.5 discriminates on the basis of sex because only females may be victims, and only males may violate the section. However, this obviously discriminatory classification scheme is readily justified by an important state interest. Unlike the sex-based classification which we invalidated in *Sail'er Inn,* and which reflected overbroad social generalizations regarding the appropriate roles of males and females, the law herein challenged is supported not by mere social convention but by the immutable physiological fact that it is the female exclusively who can become pregnant. This changeless physical law, coupled with the tragic human costs of illegitimate teenage pregnancies, generates a compelling and demonstrable state interest in minimizing both the number of such pregnancies and their disastrous consequences. Accordingly, the Legislature is amply justified in retaining its historic statutory rape law because of the potentially devastating social and economic results which may follow its violation.

Pregnancies among unwed teenage girls constitute a major contemporary human problem the dimensions of which may be illustrated by a few current statistics. Between 1971 and 1976, 83.6 percent of the 4,860 children born in California to girls under 15 years of age were illegitimate. During this same period, of the 112,682 children born to girls from 15 to 17 years of age, 51 percent were illegitimate. An average of 37.5 percent of births to all teenage mothers from 1971 to 1976 were out-of-wedlock. In contrast, approximately 15 percent of births to women of all ages during a comparable period were illegitimate. (Cal. Dept. of Health Services, Center for Health Statistics, Birth Cohort Records.) We may conclude that the problem of illegitimate births to teenagers is serious.

The fact that most teenage pregnancies are unwanted is evidenced by the fact that teenagers seek and utilize a disproportionate amount of abortion services. While teenagers accounted for 21 percent of all pregnancies in 1976, 48 percent terminated their pregnancies by induced abortion, thus accounting for 34.7 percent of all legal abortions in California. (*Id.*; see also, Green & Potteiger, Teenage Pregnancy: A Major Problem for Minors (Zero Population Growth Pamp. 1977); 11 Million Teenagers (Alan Guttmacher Institute 1977).)

Furthermore, births to teenage mothers pose substantially increased medical risks as evidenced by the record of complications reported on the birth certificates in one-fourth of recent teenage pregnancies. (Cal. Dept. of Health Services, Center for Health Statistics, Birth Cohort

Records, *supra.*) For both the adolescent mother and her infant there is a measurably greater risk of death, illness, or injury than for women in their 20s.

Finally, "The social consequences of teenage childbearing are even more pervasive than the health consequences. Thus, eight out of 10 women who first become mothers at age 17 or younger never complete high school—twice as high a proportion as those who do not give birth until they are 20 or older. A recent study clearly finds that the pregnancy directly causes the dropout, independent of any effect of antecedent education achievement or aptitude." (Lincoln, Is Pregnancy Good for Teenagers? (Alan Guttmacher Institute, U.S.A. Today, July 1978) pp. 34, 36.)

The injurious effects of pregnancy on an unwed teenager are thus substantial, far-reaching, and may well include severe physical, mental and emotional trauma. In our view a responsible Legislature need not blind itself to these serious sociological consequences. Understandably concerned about the scope of these problems it may, in an era of growing permissiveness, choose to meet them in a variety of ways. It may encourage sex education in schools and provide for the dissemination of relevant educational information and medical attention in the manner described in Civil Code section 34.5. It may also, in our view, properly attack the problem more directly by expressly prohibiting acts of sexual intercourse performed by a male with a female, not the wife of the perpetrator, who is under the age of 18 years.

Once the state has established a valid and compelling interest in preventing pregnancies among unwed teenage girls and further determines to implement that interest, in part, by imposing a criminal sanction proscribing sexual relations with minor females, it inevitably follows that sex is the only possible and therefore *necessary* classification which can be adopted in identifying offender and victim. The Legislature is well within its power in imposing criminal sanctions against males, alone, because they are the *only* persons who may physiologically cause the result which the law properly seeks to avoid.

Defendant contends, however, that even if the prevention of pregnancy is a compelling state interest, the classification scheme of the statute is both overly broad and unnecessary to the protection of the female minor. He suggests that the state's interest in preventing pregnancy could be served equally well by removing from the ambit of

the statute, either as female victims or male offenders, all those who use birth control devices or techniques and all those otherwise incapable of procreation. We disagree, adopting in this connection the sound reasoning of the Supreme Judicial Court of Maine in *State* v. *Rundlett* (Me. 1978) 391 A.2d 815, wherein, responding to a similar argument, it recently said, "We doubt that legislators, intent on use of the criminal law to prevent juvenile pregnancies, would throw such a roadblock in the way of effective prosecution as would be created by subjecting an under-age prosecutrix to cross-examination of such additionally embarrassing and uncertain details. Furthermore, we believe legislators' rejection of the defenses suggested . . . reflect[s] their reluctance to rely, for accomplishment of their anti-pregnancy objective, upon the doubtful efficacy of contraceptives and the truth of the inevitable claim of non-emission by a male charged with statutory rape." (P. 821, fn. 18.)

We also are unable to accept the contrary argument that the statute is impermissibly *underinclusive* and must, in order to pass constitutional muster, be *broadened* so as to hold the female equally culpable. It is the prerogative, indeed the duty, of the Legislature to recognize degrees of culpability when drafting a Penal Code. It follows that the Legislature may reasonably conclude that the minor female who engages, however willingly, in sexual relations is subjected to risks and adverse consequences, both prenatal and postnatal, albeit of another kind, far greater than those which may befall her male counterpart. To hold otherwise defies not only common sense and reality, but the fundamental laws of biology.

█ We note that *all* minors, male and female, are protected from sexual abuse under sections 272 (contributing to the delinquency of a minor) and 288 (lewd and lascivious conduct upon the body of a child under 14). Women may be prosecuted under these statutes if they engage in sexual relations with underage males. (See *People* v. *Mackey* (1975) 46 Cal.App.3d 755, 760 [120 Cal.Rptr. 157].) █ Section 261.5 merely provides additional protection for minor females in recognition of the demonstrably greater injury, physical and emotional, which they may suffer.

We find significance in the fact that in all of jurisprudence the only case upon which defendant can rely for his constitutional challenge is *Meloon* v. *Helgemoe* (1st Cir. 1977) 564 F.2d 602. But *Meloon,* as even the most cursory reading reveals, involved a statutory scheme un-

der which it was declared to be a felony for a male to have consensual relations with a female under the age of 15, while it was not a crime *of any kind* for a woman to have consensual sexual relations with a male under 15. (P. 603.) It thus becomes apparent that the *Meloon* court was called upon to evaluate a statutory scheme quite different from that before us.

Furthermore, the Legislature may well have believed that the criminal prosecution of a minor female equally with a male would, as a practical matter, effectively eliminate any possibility whatever of prosecution under the statute. A potential prosecutrix, or her family, would be unlikely ever to complain if she would herself be subject to a prosecution on identical charges. Because the Legislature has enacted this legislation with the principal objective of protecting minor females as a class it is not surprising that it simultaneously elected to exclude the victim herself from the statutory proscription.

We emphatically reject defendant's contention that to uphold the constitutionality of section 261.5 necessarily creates adverse inferences concerning the capacity of minor females to make intelligent and volitional decisions. By its adoption of section 261.5 the Legislature necessarily acknowledged the obvious truism that minor females are fully capable of freely and voluntarily consenting to sexual relations. If this was not so, the charge brought in these cases would uniformly be one of forcible rape. (§ 261.) ■ The statute makes no statement about the girl's ability to consent. Rather, the statute merely prohibits the act of sexual intercourse with an underage female not the wife of the perpetrator rejecting consent as a defense. In this regard section 261.5 is no different than a variety of other statutes which prohibit minors from engaging in certain activities of much less consequence to the minor, no matter how well informed, how knowledgeable and how willing or consenting the minor might be. (E.g., §§ 308 [selling or furnishing tobacco to minor], 310 [minor under 16 may not attend prizefight], 326.5 [no minor may participate in bingo game].)

■ It is quite possible that the Legislature, if it so elected, could adopt a gender-neutral statute prohibiting sexual relations with minors of *either* sex, or it might, in some other way, modify the present statute in accordance with defendant's urgings. However, the Legislature is not constitutionally compelled to do so, and thus far for reasons satisfying to itself has not done so. Furthermore, we note that in all of those states which assertedly have adopted a neutral rule, the change was effected

in every instance by *legislative* action. Not a single state has adopted such a rule by *judicial* decree.

The petition for writ of prohibition is denied.

Bird, C. J., Clark, J., and Manuel, J., concurred.

MOSK, J.—I dissent.

I cannot subscribe to the implied premise of the majority that the female of the human species is weak, inferior, and in need of paternalistic protection from the state. That concept is an anachronism in a society in which females have achieved remarkable progress toward equality. The tutelary syndrome of Victorian days has yielded to a new era in which women are contributing their talents in every field of endeavor—as prime ministers, governors, legislators, judges, corporate executives, lawyers, scientists, medical doctors, police officers, and professional athletes.

In this modern context, I conclude that Penal Code section 261.5, which defines "unlawful sexual intercourse" as "an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female is under the age of 18 years," creates a classification by sex that is impermissible under our decision in *Sail'er Inn* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], and violates the equal protection guarantee of article I, section 7, subdivision (a), of the California Constitution.

The majority gloss quickly over the facts of this case. Yet they illustrate once again the fundamental unfairness of a law that always punishes the young man and never the young woman for a joint act of which she was often equally the cause.

At the time of the incident the defendant herein, Michael, was 17½ years old; the so-called "victim," Sharon, was only 1 year and 18 days younger than he. On the evening in question, Sharon and her 21-year-old sister bought half a pint of whiskey and 2 Pepsi-Colas to use as mixers. After making this purchase they walked to a bus stop; Michael and two other male youths rode by on their bicycles, then returned and asked the girls if they would like to drink some wine. The girls replied affirmatively, and accompanied the boys to the railroad tracks. The group drank while walking to the tracks, and continued to do so on arri-

val. Sharon and Michael then went into the bushes, lay down, and began kissing and hugging for half an hour. They were interrupted by Sharon's sister, who asked Sharon if she was ready to leave. Sharon replied that she was not, and her sister left with one of the other boys. With remarkable impartiality, and on her own initiative, Sharon then began kissing the third boy. After he too departed, Sharon and Michael went to a park, lay down on a bench, and resumed their sexual activities. In due course Michael told Sharon to remove her pants, and when at first she demurred he allegedly struck her twice. Sharon testified she then said to herself, "Forget it," and decided to let him do as he wished. The couple then had intercourse.

## I

Defendant contends that Penal Code section 261.5 denies him equal protection of the laws under the California Constitution. The majority concede, as they must, that the statute discriminates on the basis of sex because it punishes males who engage in consensual sexual intercourse with females under the age of 18, but not females who perform the same act with males under the age of 18. Accordingly, as the majority further concede, we must carefully scrutinize section 261.5 to determine whether the governmental interest it serves is sufficiently compelling to justify it under the equal protection clause. This determination requires us to examine not only the nature of the interest sought to be promoted, but also the extent to which the statute is narrowly tailored to achieve that objective. (*Sail'er Inn, Inc.* v. *Kirby* (1971) *supra,* 5 Cal.3d at pp. 16-17; *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 406 [138 Cal.Rptr. 293, 563 P.2d 849].)

The Attorney General proposes, and the majority adopt his suggestion, that a general governmental interest in reducing pregnancies among unwed teenage girls be invoked to justify the sexual discrimination of section 261.5. In support the majority recite the obvious—that only females can conceive and bear children—and rely on studies showing that illegitimate teenage pregnancies are a significant medical and social problem today.

I do not underestimate the dimensions of that problem. But in analyzing suspect sexual classifications we must not be misled by appearances: we must determine whether the justification asserted for

upholding the statute can legitimately be identified as among its actual purposes, or whether instead the classification is in fact a product of traditional sexual stereotypes and hence conflicts with the equal protection clause. (*Arp, supra,* at pp. 404-406 of 19 Cal.3d.) As Justice Richardson explained for a unanimous court in *Arp* (*id.* at p. 404), "We do not feel compelled to accept without inquiry 'the mere recitation of a benign, compensatory purpose,' particularly when that purpose is 'not at all self-evident' and in fact seems historically improbable," quoting *Weinberger* v. *Wiesenfeld* (1975) 420 U.S. 636, 648 [43 L.Ed.2d 514, 525, 95 S.Ct. 1225], and *Craig* v. *Boren* (1976) 429 U.S. 190, 199, footnote 7 [50 L.Ed.2d 397, 408, 97 S.Ct. 451]. This is because the mere recitation of a benign purpose "is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." (Fn. omitted; *Weinberger, supra,* at p. 648 of 420 U.S. [43 L.Ed.2d at p. 525].)

Neither the Attorney General nor the majority offer any support for their theory that the prevention of pregnancy is or even was among the purposes of section 261.5, and both the history and wording of the statute lead to a contrary conclusion. As presently codified the section proscribes the conduct commonly referred to as statutory rape. The modern prohibition against this conduct dates back to the Statutes of Westminster enacted during the reign of Edward I at the close of the 13th century. (3 Edw. 1, ch. 13 (1275); 13 Edw. 1, ch. 34 (1285); see 4 Blackstone, Commentaries 212.) The age of consent at that time was 12 years, and in 1576 it was reduced by statute to 10. (18 Eliz. 1, ch. 7, § 4.) The latter statute was held to be part of the common law of England that was brought to the United States. (Myers, *Reasonable Mistake of Age: A Needed Defense to Statutory Rape* (1965) 64 Mich.L.Rev. 105, 110.) Its purpose was simply to prohibit sexual intercourse with the underage female because she was believed to be "too young to understand the nature and quality of her act" (*ibid.*) and hence incapable of intelligently consenting thereto. The common law is devoid of any evidence that statutory rape law was intended to prevent such females from becoming pregnant.

Statutory rape law in California had its origin in a provision of our first penal statute (Stats. 1850, ch. 99, § 47, p. 234), subsequently reenacted as section 261, subdivision 1, of the Penal Code of 1872. These early statutes proscribed sexual intercourse with females under the age

of 10, thereby following the English statute of 1576. In 1889, the California statute was amended to make the age 14. (Stats. 1889, ch. 191, § 1, p. 223.) In 1897, the age was advanced to 16. (Stats. 1897, ch. 139, § 1, p. 201.) And in 1913 it was fixed at 18, where it now remains. (Stats. 1913, ch. 122, § 1, p. 212.)

In light of its origins surely it is at least "historically improbable" (*Arp, supra,* at p. 404 of 19 Cal.3d) that the purpose of the statute was prevention of pregnancy. As first enacted, the statute made punishable "Every person of the age of fourteen years and upwards, who shall have carnal knowledge of any female child under the age of ten years, either with or without her consent" (Stats. 1850, ch. 99, § 47, p. 234). It is a known and indisputable fact—of which we are therefore bound to take judicial notice (Evid. Code, § 451, subd. (f))—that because of physiological immaturity the chances that a child of nine years of age or younger can be impregnated are essentially nil. As the majority put it in another context, "To hold otherwise defies not only common sense and reality, but the fundamental laws of biology." (*Ante,* p. 613.)

The true intent of the Legislature in adopting the California statutory rape law, rather, is revealed in the draftsmen's notes to the Penal Code of 1872. Echoing the view of the common law and citing Blackstone, the draftsmen explained that "This provision embodies the well settled rule of the existing law; that a girl under ten years of age is *incapable of giving any consent* to an act of intercourse which can reduce it below the grade of rape." (Italics added.) (Code commissioners' note, subd. 1, foll. Pen. Code, § 261 (1st ed. 1872) p. 111.) There was no mention whatever of pregnancy prevention.

Nor does the gradual increase in the age of consent between 1889 and 1913 provide a legitimate basis for inferring that pregnancy prevention ever became a goal of the statute. To begin with, under the strict scrutiny test admittedly controlling here it is the state's burden to demonstrate that such changes in the law support its claim of the legislative purpose. But that burden is not and cannot be met. The Attorney General fails to provide us with any reason for these amendments, less still to show they relate in the slightest degree to the age at which a female can conceive. And it could not credibly be asserted that during the period in question, by successive increments of four, two, and two years, the age of female puberty in California rose from ten to eighteen. Again we must take judicial notice of a known and indisputable fact, to wit, that young women are physiologically mature well before they reach their

18th birthday. Thus just as the age of nine is too low for the majority's theory, eighteen is too high: the statute simply cannot be made to fit the pregnancy prevention rationale.

In any event, a far more plausible explanation for these amendments of the statute appears from other legislative history: the age defining this offense was undoubtedly increased because popular views changed both with regard to the suitable age of women for marriage and the age until which they were deemed appropriately subject to protective legislation. Thus section 56 of the Civil Code of 1872 fixed 15 as the age at which a female could marry without parental consent, but in 1921 the age was raised to 18. (Stats. 1921, ch. 233, § 1, p. 333 [now see Civ. Code, § 4101, subd. (a)].)[1]

Moreover, even after the age of consent had been raised to a level at which conception became biologically possible, this court continued to declare that "The obvious purpose of [the statutory rape law] is the protection of society by protecting from violation the *virtue* of young and unsophisticated girls." (Italics added.) (*People* v. *Verdegreen* (1895) 106 Cal. 211, 214 [39 P. 607]; see also *People* v. *Lourintz* (1896) 114 Cal. 628, 630 [46 P. 613].) Indeed, the court in *Verdegreen* considered the statutory purpose of protecting the virtue of inexperienced young girls to be so pervasive that it held "advances" made with intent to commit statutory rape could constitute an assault to commit that offense. It stated: "It is the insidious approach and vile tampering with their persons that primarily undermines the virtue of young girls, and eventually destroys it; and the prevention of this, as much as the principal act, must undoubtedly have been the intent of the legislature. The incapacity extends to the act and all its incidents." (106 Cal. at p. 215.) Such "approach" and "tampering," of course, cannot result in pregnancy.

Finally, we recognized the same purpose of the statute—to protect the virtue of young girls—long after the age was raised to 18. In the landmark decision of *People* v. *Hernandez* (1964) 61 Cal.2d 529, 531 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092], we stated that the statutory rape law conclusively assumes the under-age female incapable

---

[1] A similar evolution occurred with respect to the minimum age at which minors were protected by child labor laws from industrial exploitation and injury. (See, e.g., Stats. 1905, ch. 18, p. 11; Stats. 1919, ch. 259, p. 415; Stats. 1937, ch. 90, § 1290 et seq., p. 219 et seq. [now Lab. Code, § 1290 et seq.].)

of giving informed consent to sexual intercourse because "she is presumed too innocent and naive to understand the implications and nature of her act. [Citations.] The law's concern with her capacity or lack thereof to so understand is explained in part by a popular conception of the social, moral and personal values which are preserved by the abstinence from sexual indulgence on the part of a young woman. An unwise disposition of her sexual favor is deemed to do harm both to herself and the social mores by which the community's conduct patterns are established. Hence the law of statutory rape intervenes in an effort to avoid such a disposition." Again there was no mention of pregnancy prevention; and the majority point to no legislative history since the date of *Hernandez* to support their repudiation of that unanimous decision's reading of the statutory purpose.[2]

The language of section 261.5 confirms the lessons of its history. The statute makes no attempt to define culpability in terms of sexual intercourse that creates a risk of pregnancy. It does not permit a defense that the couple used contraceptives or employed other pregnancy prevention techniques, even in cases in which the method of contraception is extremely effective.[3] Nor does the statute make any exception for cases in which either the male or female is sterile, or emission did not occur; yet emission is not a prerequisite to conviction, for "Any sexual penetration, however slight, is sufficient to complete the crime." (Pen. Code, § 263; see, e.g., *People* v. *Howard* (1904) 143 Cal. 316, 317 [76 P. 1116].) Finally, since *all* girls under the age of 18 fall within its scope, the statute punishes intercourse with a substantial number for whom, as noted above, conception is a sheer impossibility simply because of physiological immaturity.

In short, reducing illicit pregnancies among teenage girls may well be a laudable governmental objective, but it is wishful thinking to believe that the California statutory rape law was actually enacted or reenacted

---

[2]It is true that in 1970 the Legislature separated the prohibition against statutory rape from the forcible rape provisions of Penal Code section 261, and recodified it as "unlawful sexual intercourse" in section 261.5. (Stats. 1970, ch. 1301, § 2, p. 2406.) But the recodification in no way changed the definition of the offense, and the majority do not claim it had any substantive significance.

[3]On this point the majority simply adopt the reasoning of *State* v. *Rundlett* (Me. 1978) 391 A.2d 815, 821, footnote 18, which is premised inter alia on the claimed "doubtful efficacy of contraceptives" (*ante,* p. 613). Here again reality is otherwise: certain pregnancy prevention devices (e.g., condoms and contraceptive pills) are both efficacious and widely available to 17-year-old men and women. The majority's disregard of this well-known fact does not make it any less true.

for the purpose. Under the cases cited at the outset, therefore, it may not properly be invoked to save the statute. (See, e.g., *Arp,* at p. 404 of 19 Cal.3d; *Weinberger,* at p. 648 of 420 U.S. [43 L.Ed.2d at p. 525].)

## II

Even if section 261.5 were actually intended to prevent pregnancy, its classification scheme nevertheless remains constitutionally deficient. The conduct that creates the risk of pregnancy is an act of sexual intercourse in which *both* the male and the female participate. The act may have been solicited by the male, by the female, or simultaneously by both, and by definition it was wholly consensual. Thus when both parties participate in the decision to engage in the sexual act, each must be presumed equally responsible if pregnancy results.[4] Yet the statute, if it seeks to reduce pregnancy among unwed teenage girls, does so by punishing only the male for his part in this joint conduct. Although it is true that biologically only females can become pregnant, no compelling justification has been offered for holding the male but not the female criminally responsible for the same act. The statute is therefore impermissibly underinclusive. (See, e.g., *Tatro* v. *State* (Miss. 1979) 372 So.2d 283 [statute making it a felony for a male but not a female to sexually fondle a child under 14, held to violate equal protection]; *Commonwealth* v. *MacKenzie* (1975) 368 Mass. 613 [334 N.E.2d 613] [statute making it a misdemeanor for father but not mother to beget a child out of wedlock, held to violate equal protection]; *Lamb* v. *Brown* (10th Cir. 1972) 456 F.2d 18 [statute giving females under 18 the benefit of juvenile court proceedings but limiting those same benefits to males under 16, held to violate equal protection].)

The majority's arguments to the contrary are demonstrably inadequate. The majority first posit that it is the Legislature's prerogative to recognize "degrees of culpability" when drafting criminal laws. (*Ante,* p. 613.) But the majority then fall into a complete non sequitur when they find it "follows" therefrom (*ibid.*) that the Legislature may reasonably believe that because of the possibility of pregnancy, the female runs greater medical and social risks in sexual intercourse than the

---

[4]The section cannot be sustained on the ground that it protects minor females from being unwittingly persuaded to engage in the act by more sophisticated adult males because, as long as the female is under the age of 18, the male can be punished even if he is the same age or younger than the female. Defendant herein, for example, is virtually the same age as the complaining witness.

male. Of course she runs greater risks if adequate contraceptive measures are not taken; but they are the consequences rather than the causes of her act, and are therefore wholly irrelevant to weighing her moral blame in committing the act in the first place. In our system of justice, offenders are not deemed less culpable merely because they may suffer additional punishment from sources outside the legal system. For example, an outwardly respectable person who engages in illicit drug activity is not rendered less blameworthy when his arrest and conviction for that conduct also result in social ostracism and loss of professional status.

Secondly, the majority reason that because minors are protected from sexual abuse by certain other provisions of law (Pen. Code, §§ 272, 288), section 261.5 "merely provides additional protection for minor females in recognition of the demonstrably greater injury, physical and emotional, which they may suffer." (*Ibid.*) This is another non sequitur. Neither of the statutes relied on by the majority draws any distinction based on sex: section 272 punishes "Every person" who contributes to the delinquency of "any person under the age of 18 years," while section 288 punishes "Any person" who commits lewd or lascivious acts upon "a child under the age of 14 years." The fact that those statutes are gender-neutral does not somehow give the Legislature the right to enact an "additional" law on the topic that invidiously discriminates on sexual grounds.

Finally, the majority argue that a potential prosecutrix or her family would be unlikely to complain if she were herself subject to prosecution, and hence the inclusion of women in the statutory proscription would as a practical matter "effectively eliminate any possibility whatever of prosecution under the statute." (*Ante,* p. 614.) Surely this is an exaggeration. The testimony of the female participant is not, as the majority assume, the sole evidence of the offense in every case. Even if it were, the district attorney obviously has discretion not to file charges against her. Further, if she remains diffident about testifying to the offense in question, she can simply be granted immunity from prosecution. (Pen. Code, § 1324; see also §§ 1099, 1101 [discharge to be a witness for the prosecution].)

The majority's concern in this regard, moreoever, is evidently not shared by the legislatures of our sister states. At least 31 jurisdictions

now prohibit sexual intercourse with underage persons of either sex.[5] The majority belabor the obvious when they emphasize that in each of the cited jurisdictions the change from traditional statutory rape law to a sex-neutral classification was accomplished by legislative rather than judicial reform. But the fact that the reform has taken place on such a large scale is itself significant for two reasons. First, it refutes the majority's argument that it is necessary to exclude minor females from the statutory proscription in order to insure its enforcement: in every jurisdiction in which statutory rape is now defined as sexual intercourse by a "person" with a "person" who is under age (see, e.g., Me. Rev. Stat. Ann. tit. 17A, § 252, quoted in *State* v. *Rundlett* (Me. 1978) *supra,* 391 A.2d 815, 816, fn. 2), the minor female in a case such as the one before us would be equally punishable with the minor male. Secondly, and more broadly, the reform demonstrates the widespread belief of our sister states that the purposes of gender-based statutory rape laws —such as those previously in effect in the cited jurisdictions—can be just as effectively served by gender-neutral statutes on the same subject.

The majority conclude (*ante,* p. 614) by flatly denying that section 261.5 reflects adversely on "the capacity of minor females to make intelligent and volitional decisions" on the question of whether to be

[5]Alaska (Alaska Stat., § 11.15.120 (Cum. Supp. 1978)); Arizona (Ariz. Rev. Stat., §§ 13-1404, 13-1405 (1978)) Arkansas (Ark. Stat. Ann, §§ 41-1803, 41-1804, 41-1806 (1977)); Colorado (Colo. Rev. Stat., § 18-3-403 (Cum. Supp. 1976)); Connecticut (Conn. Gen. Stat., §53a-71 (1977)); Florida (Fla. Stat. Ann., §§ 794.011, 794.05 (West 1976)); Illinois (Ill. Stat. Ann., ch. 38, §§ 11-5, 11-6 (Smith-Hurd Supp. 1978)); Indiana (Ind. Code Ann., § 35-42-4-3 (Burns Cum. Supp. 1978)); Iowa (Iowa Code Ann., §§ 709.1-709.4 (West Supp. 1978-1979)); Kansas (Kan. Stat. Ann., § 21-3503 (Cum. Supp. 1978)); Kentucky (Ky. Rev. Stat. Ann., § 510.040 (Baldwin 1975)); Louisiana (La. Rev. Stat. Ann., § 14:42 (West Supp. 1978)); Maine (Me. Rev. Stat. Ann., tit. 17A, §§ 252, 254 (West Supp. 1978)); Maryland (Md. Crim. Law Code Ann., art. 27, §§ 463, 464A, 464B (Cum. Supp. 1978)); Massachusetts (Mass. Ann. Laws, ch. 265, § 23 (Michie/Law. Co-op Supp. 1979)); Michigan (Mich. Stat. Ann., § 28.788(2) (Cum. Supp. 1978-1979)); Minnesota (Minn. Stat. Ann., §§ 609.342-609.345 (West Supp. 1979)); Montana (Mont. Rev. Code Ann., §§ 94-5-501, 94-5-503 (1977)); Nebraska (Neb. Rev. Stat., § 28-403.03 (1975)); New Hampshire (N.H. Rev. Stat. Ann., §§ 632-A:2, 632-A:3 (Supp. 1975)); New Mexico (N.M. Stat. Ann., §§ 40A-9-21, 40A-9-23 (Supp. 1975)); North Dakota (N.D. Cent. Code, §§ 12.1-20-03, 12.1-20-05, 12.1-20-07 (Supp. 1977)); Ohio (Ohio Rev. Code Ann., §§ 2907.02, 2907.04 (Page 1975 & Supp. 1978)); Pennsylvania (Penn. Stat. Ann., tit. 18, § 3122 (Purdon Supp. 1978-1979)); South Carolina (S.C. Code, § 16-3-655 (1978)); South Dakota (S.D. Compiled Laws Ann., § 22-22-1 (Supp. 1978)); Vermont (Vt. Stat. Ann., tit. 13, § 3252 (Cum. Supp. 1978)); Washington (Wash. Rev. Code Ann., §§ 9.79.200, 9.79.210, 9.79.220 (1977)); West Virginia (W.Va. Code, §§ 61-8B-2, 61-8B-3, 61-8B-5 (1977)); Wisconsin (Wis. Stat. Ann., § 940.225 (West Supp. 1978-1979)); Wyoming (Wyo. Stat., §§ 6-63.3, 6-63.4 (Interim Supp. 1977)).

sexually active. It is true the section does not reflect on their capacity to make *volitional* decisions on the topic, and indeed it presumes the existence of that very ability. But it is no less true that the statutory rape law impugns the capacity of underage women to make such decisions *intelligently.*

The majority purport to find section 261.5 no different in this regard from other provisions of law prohibiting minors from engaging in specified activities regardless of consent. Once again, however, in each such instance the law is gender-neutral and applies equally to minors of both sexes. (See Pen. Code, §§ 308, 310, 326.5.) By contrast, although the present statute posits that both sexes are capable of consenting to sexual intercourse, it denies females the right to do so. Even if the purpose of the statute were pregnancy prevention, therefore, its practical effect is to perpetuate the age-old stereotype we recognized in *Hernandez* (at p. 531 of 61 Cal.2d), i.e., that the underage female "is presumed too innocent and naive to understand the implications and nature of her act." As seen by the public in actual operation, section 261.5 assumes that when the minor female "volitionally" decides to be sexually active, she does not really know what she is doing. *Because she is a woman* she is deemed inherently less capable of knowing the facts, of controlling her emotions, of weighing the risks and benefits, and of making intelligent choices—in short, she is less responsible for her actions—than her male counterpart. As it presently reads, the California statutory rape law thus reflects a belief that the minor female is in need of special protection not only against the male but also against herself, against her "voluntary" but presumptively imprudent decisions in matters of sex.[6]

Such notions are obviously vestiges of a bygone era, remnants of the exploded myth of intrinsic male superiority. They are the product of conventional sex-stereotypical thinking, and revive an outmoded patriarchial view of "the woman's role." Certainly it is permissible for the Legislature to enact statutes for the protection of the moral character of minors of both sexes, and in particular to prevent their sexual exploitation by persons older and more mature than they; but absent a compelling reason for doing so, equal protection forbids the law to foster one standard of socially acceptable conduct for *males* and another

---

[6]Among other consequences of this belief is the absurdity by which a man can be convicted of statutory rape when he has consensual sexual intercourse with an underage but *married* woman. (See, e.g., *People v. Caldwell* (1967) 255 Cal.App.2d 229 [63 Cal.Rptr. 63, 32 A.L.R.3d 1026]; *People v. Courtney* (1960) 180 Cal.App.2d 61 [4 Cal.Rptr. 274].)

for females. By limiting the definition of the crime "to situations in which the offender is a male and the victim a female, [statutory rape laws] are providing only an incomplete and unsatisfactory protection. At the same time, they are lending their support to society's pernicious and hypocritical double standard of sexual morality." (Kanowitz, Women and the Law (1969) p. 25.) Such considerations not only fail to justify the discrimination of section 261.5, they reinforce the argument for holding it unconstitutional.

Central to the equal protection clause is the principle that each individual, regardless of sex, is to be treated as an equal, fully participating, and responsible member of society. (See Karst, *The Supreme Court 1976 Term—Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1.) When a legislative classification perpetuates sexual stereotypes it imposes inequalities that stigmatize women and thereby undermine this principle of equal citizenship. As the United States Supreme Court recently explained in striking down a statutory scheme providing that husbands but not wives may be required to pay alimony upon divorce, "Legislative classifications which distribute benefits and burdens on the basis of gender carry the inherent risk of reinforcing the stereotypes about the 'proper place' of women and their need for special protection. [Citation.] Thus, even statutes purportedly designed to compensate for and ameliorate the effects of past discrimination must be carefully tailored. Where, as here, the State's compensatory and ameliorative purposes are as well served by a gender-neutral classification as one that gender-classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex." (*Orr* v. *Orr* (1979) 440 U.S. 268, 283 [59 L.Ed.2d 306, 321, 99 S.Ct. 1102, 1113].)

I would issue the writ of prohibition.

Tobriner, J., and Newman, J., concurred.

Petitioner's application for a rehearing was denied December 5, 1979. Tobriner, J., and Mosk, J., were of the opinion that the application should be granted.