# MICHAEL M. *v.* SUPERIOR COURT OF SONOMA COUNTY (CALIFORNIA, REAL PARTY IN INTEREST)

No. 79–1344.  Argued November 4, 1980—Decided March 23, 1981

REHNQUIST, J., announced the judgment of the Court and delivered an opinion, in which BURGER, C. J., and STEWART and POWELL, JJ., joined. STEWART, J., filed a concurring opinion, *post*, p. 476. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 481. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, *post*, p. 488. STEVENS, J., filed a dissenting opinion; *post*, p. 496.

*Gregory F. Jilka* argued the cause and filed a brief for petitioner.

*Sandy R. Kriegler,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *George Deukmejian,* Attorney General, *Robert H. Philibosian,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *William R. Pounders,* Deputy Attorney General.*

JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE STEWART, and JUSTICE POWELL joined.

The question presented in this case is whether California's "statutory rape" law, § 261.5 of the Cal. Penal Code Ann. (West Supp. 1981), violates the Equal Protection Clause of the Fourteenth Amendment. Section 261.5 defines unlawful sexual intercourse as "an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where the female is under the age of 18 years." The statute thus makes men alone criminally liable for the act of sexual intercourse.

In July 1978, a complaint was filed in the Municipal Court of Sonoma County, Cal., alleging that petitioner, then a 17½-year-old male, had had unlawful sexual intercourse with a female under the age of 18, in violation of § 261.5. The evidence adduced at a preliminary hearing showed that at approximately midnight on June 3, 1978, petitioner and two friends approached Sharon, a 16½-year-old female, and her sister as they waited at a bus stop. Petitioner and Sharon,

---

*Briefs of *amici curiae* urging reversal were filed by *Bruce J. Ennis, Jr.,* for the American Civil Liberties Union et al; and by *John W. Karr* for the Women's Legal Defense Fund.

*Solicitor General McCree, Assistant Attorney General Heymann,* and *Sara Criscitelli* filed a brief for the United States as *amicus curiae* urging affirmance.

who had already been drinking, moved away from the others and began to kiss. After being struck in the face for rebuffing petitioner's initial advances, Sharon submitted to sexual intercourse with petitioner. Prior to trial, petitioner sought to set aside the information on both state and federal constitutional grounds, asserting that § 261.5 unlawfully discriminated on the basis of gender. The trial court and the California Court of Appeal denied petitioner's request for relief and petitioner sought review in the Supreme Court of California.

The Supreme Court held that "section 261.5 discriminates on the basis of sex because only females may be victims, and only males may violate the section." 25 Cal. 3d 608, 611, 601 P. 2d 572, 574. The court then subjected the classification to "strict scrutiny," stating that it must be justified by a compelling state interest. It found that the classification was "supported not by mere social convention but by the immutable physiological fact that it is the female exclusively who can become pregnant." *Ibid.* Canvassing "the tragic human costs of illegitimate teenage pregnancies," including the large number of teenage abortions, the increased medical risk associated with teenage pregnancies, and the social consequences of teenage childbearing, the court concluded that the State has a compelling interest in preventing such pregnancies. Because males alone can "physiologically cause the result which the law properly seeks to avoid," the court further held that the gender classification was readily justified as a means of identifying offender and victim. For the reasons stated below, we affirm the judgment of the California Supreme Court.[1]

---

[1] The lower federal courts and state courts have almost uniformly concluded that statutory rape laws are constitutional. See, *e. g., Rundlett* v. *Oliver,* 607 F. 2d 495 (CA1 1979); *Hall* v. *McKenzie,* 537 F. 2d 1232 (CA4 1976); *Hall* v. *State,* 365 So. 2d 1249, 1252–1253 (Ala. App. 1978), cert. denied, 365 So. 2d 1253 (Ala. 1979); *State* v. *Gray,* 122 Ariz.

As is evident from our opinions, the Court has had some difficulty in agreeing upon the proper approach and analysis in cases involving challenges to gender-based classifications. The issues posed by such challenges range from issues of standing, see *Orr* v. *Orr,* 440 U. S. 268 (1979), to the appropriate standard of judicial review for the substantive classification. Unlike the California Supreme Court, we have not held that gender-based classifications are "inherently suspect" and thus we do not apply so-called "strict scrutiny" to those classifications. See *Stanton* v. *Stanton,* 421 U. S. 7 (1975). Our cases have held, however, that the traditional minimum rationality test takes on a somewhat "sharper focus" when gender-based classifications are challenged. See *Craig* v. *Boren,* 429 U. S. 190, 210 n.* (1976) (POWELL, J., concurring). In *Reed* v. *Reed,* 404 U. S. 71 (1971), for example, the Court stated that a gender-based classification will be upheld if it

445, 446–477, 595 P. 2d 990, 991–992 (1979); *People* v. *Mackey,* 46 Cal. App. 3d 755, 760–761, 120 Cal. Rptr. 157, 160, cert. denied, 423 U. S. 951 (1975); *People* v. *Salinas,* 191 Colo. 171, 551 P. 2d 703 (1976); *State* v. *Brothers,* 384 A. 2d 402 (Del. Super. 1978); *In re W. E. P.,* 318 A. 2d 286, 289–290 (DC 1974); *Barnes* v. *State,* 244 Ga. 302, 303–304, 260 S. E. 2d 40, 41–42 (1979); *State* v. *Drake,* 219 N. W. 2d 492, 495–496 (Iowa 1974); *State* v. *Bell,* 377 So. 2d 303 (La. 1979); *State* v. *Rundlett,* 391 A. 2d 815 (Me. 1978); *Green* v. *State,* 270 So. 2d 695 (Miss. 1972); *In re J. D. G.,* 498 S. W. 2d 786, 792–793 (Mo. 1973); *State* v. *Meloon,* 116 N. H. 669, 366 A. 2d 1176 (1976); *State* v. *Thompson,* 162 N. J. Super. 302, 392 A. 2d 678 (1978); *People* v. *Whidden,* 51 N. Y. 2d 457, 415 N. E. 2d 927 (1980); *State* v. *Wilson,* 296 N. C. 298, 311–313, 250 S. E. 2d 621, 629–630 (1979); *Olson* v. *State,* 588 P. 2d 1018 (Nev. 1979); *State* v. *Elmore,* 24 Ore. App. 651, 546 P. 2d 1117 (1976); *State* v. *Ware,* —— R. I. ——, 418 A. 2d 1 (1980); *Roe* v. *State,* 584 S. W. 2d 257, 259 (Tenn. Crim. App. 1979); *Ex parte Groves,* 571 S. W. 2d 888, 892–893 (Tex. Crim. App. 1978); *Moore* v. *McKenzie,* 236 S. E. 2d 342, 342–343 (W. Va. 1977); *Flores* v. *State,* 69 Wis. 2d 509, 510–511, 230 N. W. 2d 637, 638 (1975). Contra, *Navedo* v. *Preisser,* 630 F. 2d 636 (CA8 1980); *United States* v. *Hicks,* 625 F. 2d 216 (CA9 1980); *Meloon* v. *Helgemoe,* 564 F. 2d 602 (CA1 1977) (limited in *Rundlett* v. *Oliver, supra*), cert. denied, 436 U. S. 950 (1978).

bears a "fair and substantial relationship" to legitimate state ends, while in *Craig* v. *Boren, supra,* at 197, the Court restated the test to require the classification to bear a "substantial relationship" to "important governmental objectives."

Underlying these decisions is the principle that a legislature may not "make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class." *Parham* v. *Hughes,* 441 U. S. 347, 354 (1979) (plurality opinion of STEWART, J.). But because the Equal Protection Clause does not "demand that a statute necessarily apply equally to all persons" or require " 'things which are different in fact . . . to be treated in law as though they were the same,' " *Rinaldi* v. *Yeager,* 384 U. S. 305, 309 (1966), quoting *Tigner* v. *Texas,* 310 U. S. 141, 147 (1940), this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances. *Parham* v. *Hughes, supra; Califano* v. *Webster,* 430 U. S. 313 (1977); *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975); *Kahn* v. *Shevin,* 416 U. S. 351 (1974). As the Court has stated, a legislature may "provide for the special problems of women." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 653 (1975).

Applying those principles to this case, the fact that the California Legislature criminalized the act of illicit sexual intercourse with a minor female is a sure indication of its intent or purpose to discourage that conduct.[2] Precisely why the legislature desired that result is of course somewhat less clear. This Court has long recognized that "[i]nquiries into congressional motives or purposes are a hazardous matter," *United States* v. *O'Brien,* 391 U. S. 367, 383–384 (1968); *Palmer* v. *Thompson,* 403 U. S. 217, 224 (1971), and the

---

[2] The statute was enacted as part of California's first penal code in 1850, 1850 Cal. Stats., ch. 99, § 47, p. 234, and recodified and amended in 1970.

search for the "actual" or "primary" purpose of a statute is likely to be elusive. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 265 (1977); *McGinnis* v. *Royster*, 410 U. S. 263, 276–277 (1973). Here, for example, the individual legislators may have voted for the statute for a variety of reasons. Some legislators may have been concerned about preventing teenage pregnancies, others about protecting young females from physical injury or from the loss of "chastity," and still others about promoting various religious and moral attitudes towards premarital sex.

The justification for the statute offered by the State, and accepted by the Supreme Court of California, is that the legislature sought to prevent illegitimate teenage pregnancies. That finding, of course, is entitled to great deference. *Reitman* v. *Mulkey,* 387 U. S. 369, 373–374 (1967). And although our cases establish that the State's asserted reason for the enactment of a statute may be rejected, if it "could not have been a goal of the legislation," *Weinberger* v. *Wiesenfeld, supra,* at 648, n. 16, this is not such a case.

We are satisfied not only that the prevention of illegitimate pregnancy is at least one of the "purposes" of the statute, but also that the State has a strong interest in preventing such pregnancy. At the risk of stating the obvious, teenage pregnancies, which have increased dramatically over the last two decades,[3] have significant social, medical, and economic consequences for both the mother and her child, and the State.[4]

---

[3] In 1976 approximately one million 15-to-19-year-olds became pregnant, one-tenth of all women in that age group. Two-thirds of the pregnancies were illegitimate. Illegitimacy rates for teenagers (births per 1,000 unmarried females ages 14 to 19) increased 75% for 14-to-17-year-olds between 1961 and 1974 and 33% for 18-to-19-year-olds. Alan Guttmacher Institute, 11 Million Teenagers 10, 13 (1976); C. Chilman, Adolescent Sexuality In a Changing American Society 195 (NIH Pub. No. 80–1426, 1980).

[4] The risk of maternal death is 60% higher for a teenager under the age of 15 than for a women in her early twenties. The risk is 13% higher

Of particular concern to the State is that approximately half of all teenage pregnancies end in abortion.[5] And of those children who are born, their illegitimacy makes them likely candidates to become wards of the State.[6]

We need not be medical doctors to discern that young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity. The statute at issue here

for 15-to-19-year-olds. The statistics further show that most teenage mothers drop out of school and face a bleak economic future. See, e. g., 11 Million Teenagers, supra, at 23, 25; Bennett & Bardon, The Effects of a School Program On Teenager Mothers and Their Children, 47 Am. J. Orthopsychiatry 671 (1977); Phipps-Yonas, Teenage Pregnancy and Motherhood, 50 Am. J. Orthopsychiatry 403, 414 (1980).

[5] This is because teenagers are disproportionately likely to seek abortions. Center for Disease Control, Abortion Surveillance 1976, pp. 22–24 (1978). In 1978, for example, teenagers in California had approximately 54,000 abortions and 53,800 live births. California Center for Health Statistics, Reproductive Health Status of California Teenage Women 1, 23 (Mar. 1980).

[6] The policy and intent of the California Legislature evinced in other legislation buttresses our view that the prevention of teenage pregnancy is a purpose of the statute. The preamble to the Pregnancy Freedom of Choice Act, for example, states: "The legislature finds that pregnancy among unmarried persons under 21 years of age constitutes an increasing social problem in the State of California." Cal. Welf. & Inst. Code Ann. § 16145 (West 1980).

Subsequent to the decision below, the California Legislature considered and rejected proposals to render § 261.5 gender neutral, thereby ratifying the judgment of the California Supreme Court. That is enough to answer petitioner's contention that the statute was the " 'accidental by-product of a traditional way of thinking about females.' " *Califano* v. *Webster*, 430 U. S. 313, 320 (1977) (quoting *Califano* v. *Goldfarb*, 430 U. S. 199, 223 (1977) (STEVENS, J., concurring in judgment)). Certainly this decision of the California Legislature is as good a source as is this Court in deciding what is "current" and what is "outmoded" in the perception of women.

472

protects women from sexual intercourse at an age when those consequences are particularly severe.[7]

The question thus boils down to whether a State may attack the problem of sexual intercourse and teenage pregnancy directly by prohibiting a male from having sexual intercourse with a minor female.[8]   We hold that such a statute is

[7] Although petitioner concedes that the State has a "compelling" interest in preventing teenage pregnancy, he contends that the "true" purpose of § 261.5 is to protect the virtue and chastity of young .women.   As such, the statute is unjustifiable because it rests on archaic stereotypes.   What we have said above is enough to dispose of that· contention.   The question for us—and the only question under the Federal/Constitution—is whether the legislation violates the Equal Protection Clause of the Fourteenth Amendment, not whether its supporters may have/endorsed it for reasons no longer generally accepted.   Even if the preservation of female chastity were one of the motives of the statute, and even if that motive be impermissible, petitioner's argument must fail because "[i]t is a familiar practice of constitutional law that this court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States* v. *O'Brien,* 391 U. S. 367, 383 (1968).   In *Orr* v. *Orr,* 440 U. S. 268 (1979), for example, the Court rejected one asserted purpose as impermissible, but then considered other purposes to determine if they could justify the statute.   Similarly, in *Washington* v. *Davis,* 426 U. S. 229, 243 (1976), the Court distinguished *Palmer* v. *Thompson,* 403 U. S. 217 (1971), on the grounds that the purposes of the ordinance there were not open to impeachment by evidence that the legislature was actually motivated by an impermissible purpose.   See also *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 270, n. 21 (1977); *Mobile* v. *Bolden,* 446 U. S. 55, 91 (1980) (STEVENS, J., concurring in judgment).

[8] We do not understand petitioner to question a State's authority to make sexual intercourse among teenagers a criminal act, at least on a gender-neutral basis.   In *Carey* v. *Population Services International,* 431 U. S. 678, 694, n. 17 (1977) (plurality opinion of BRENNAN, J.), four Members of the Court assumed for the purposes of that case that a State may regulate the sexual behavior of minors, while four other Members of the Court more emphatically stated that such regulation ·would be permissible.   *Id.,* at 702, 703 (WHITE, J., concurring in part and concurring in result); *id.,* at 705–707, 709 (POWELL, J., concurring in part and concurring in judgment); *id.,* at 713 (STEVENS, J., concurring in part and

sufficiently related to the State's objectives to pass constitutional muster.

Because virtually all of the significant harmful and inescapably identifiable consequences of teenage pregnancy fall on the young female, a legislature acts well within its authority when it elects to punish only the participant who, by nature, suffers few of the consequences of his conduct. It is hardly unreasonable for a legislature acting to protect minor females to exclude them from punishment. Moreover, the risk of pregnancy itself constitutes a substantial deterrence to young females. No similar natural sanctions deter males. A criminal sanction imposed solely on males thus serves to roughly "equalize" the deterrents on the sexes.

We are unable to accept petitioner's contention that the statute is impermissibly underinclusive and must, in order to pass judicial scrutiny, be *broadened* so as to hold the female as criminally liable as the male. It is argued that this statute is not *necessary* to deter teenage pregnancy because a gender-neutral statute, where both male and female would be subject to prosecution, would serve that goal equally well. The relevant inquiry, however, is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the California Legislature is within constitutional limitations. *Kahn* v. *Shevin,* 416 U. S., at 356, n. 10.

In any event, we cannot say that a gender-neutral statute would be as effective as the statute California has chosen to enact. The State persuasively contends that a gender-neutral statute would frustrate its interest in effective enforcement. Its view is that a female is surely less likely to report

concurring in judgment); *id.,* at 718 (REHNQUIST, J., dissenting). The Court has long recognized that a State has even broader authority to protect the physical, mental, and moral well-being of its youth, than of its adults. See, *e. g., Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 72–74 (1976); *Ginsberg* v. *New York,* 390 U. S. 629, 639–640 (1968); *Prince* v. *Massachusetts,* 321 U. S. 158, 170 (1944).

violations of the statute if she herself would be subject to criminal prosecution.[9]   In an area already fraught with prosecutorial difficulties, we decline to hold that the Equal Protection Clause requires a legislature to enact a statute so broad that it may well be incapable of enforcement.[10]

---

[9] Petitioner contends that a gender-neutral statute would not hinder prosecutions because the prosecutor could take into account the relative burdens on females and males and generally only prosecute males.   But to concede this is to concede all.   If the prosecutor, in exercising discretion, will virtually always prosecute just the man and not the woman, we do not see why it is impermissible for the legislature to enact a statute to the same effect.

[10] The question whether a statute is *substantially* related to its asserted goals is at best an opaque one.   It can be plausibly argued that a gender-neutral statute would produce fewer prosecutions than the statute at issue here.   See STEWART, J., concurring, *post,* at 481, n. 13.   JUSTICE BRENNAN's dissent argues, on the other hand, that

"even assuming that a gender-neutral statute would be more difficult to enforce, . . . [c]ommon sense . . . suggests that a gender-neutral statutory rape law is potentially a greater deterrent of sexual activity than a gender-based law, for the simple reason that a gender-neutral law subjects both men and women to criminal sanctions and thus arguably has a deterrent effect on twice as many potential violators." *Post,* at 493–494 (emphasis deleted).

Where such differing speculations as to the effect of a statute are plausible, we think it appropriate to defer to the decision of the California Supreme Court, "armed as it was with the knowledge of the facts and circumstances concerning the passage and potential impact of [the statute], and familiar with the milieu in which that provision would operate." *Reitman* v. *Mulkey,* 387 U. S. 369, 378–379 (1967).

It should be noted that two of the three cases relied upon by JUSTICE BRENNAN's dissent are readily distinguishable from the instant one.   See *post,* at 490, n. 3.   In both *Navedo* v. *Preisser,* 630 F. 2d 636 (CA8 1980), and *Meloon* v. *Helgemoe,* 564 F. 2d 602 (CA1 1977), cert. denied, 436 U. S. 950 (1978), the respective governments asserted that the purpose of the statute was to protect young women from physical injury.   Both courts rejected the justification on the grounds that there had been no showing that young females are more likely than males to suffer physical injury from sexual intercourse.   They further held, contrary to our decision, that

We similarly reject petitioner's argument that § 261.5 is impermissibly overbroad because it makes unlawful sexual intercourse with prepubescent females, who are, by definition, incapable of becoming pregnant. Quite apart from the fact that the statute could well be justified on the grounds that very young females are particularly susceptible to physical injury from sexual intercourse, see *Rundlett* v. *Oliver,* 607 F. 2d 495 (CA1 1979), it is ludicrous to suggest that the Constitution requires the California Legislature to limit the scope of its rape statute to older teenagers and exclude young girls.

There remains only petitioner's contention that the statute is unconstitutional as it is applied to him because he, like Sharon, was under 18 at the time of sexual intercourse. Petitioner argues that the statute is flawed because it presumes that as between two persons under 18, the male is the culpable aggressor  We find petitioner's contentions unpersuasive. Contrary to his assertions, the statute does not rest on the assumption that males are generally the aggressors. It is instead an attempt by a legislature to prevent illegitimate teenage pregnancy by providing an additional deterrent for men. The age of the man is irrelevant since young men are as capable as older men of inflicting the harm sought to be. prevented.

In upholding the California statute we also recognize that this is not a case where a statute is being challenged on the grounds that it "invidiously discriminates" against females.

pregnancy prevention was not a "plausible" purpose of the legislation. Thus neither court reached the issue presented here, whether the statute is substantially related to the prevention of teenage pregnancy. Significantly, *Meloon* has been severely limited by *Rundlett* v. *Oliver,* 607 F. 2d 495 (CA1 1979), where the court upheld a statutory rape law on the ground that the State had shown that sexual intercourse physically injures young women more than males. Here, of course, even JUSTICE BRENNAN's dissent does not dispute that young women suffer disproportionately the deleterious consequences of illegitimate pregnancy.

To the contrary, the statute places a burden on males which is not shared by females. But we find nothing to suggest that men, because of past discrimination or peculiar disadvantages, are in need of the special solicitude of the courts. Nor is this a case where the gender classification is made "solely for . . . administrative convenience," as in *Frontiero* v. *Richardson*, 411 U. S. 677, 690 (1973) (emphasis omitted), or rests on "the baggage of sexual stereotypes" as in *Orr* v. *Orr*, 440 U. S., at 283. As we have held, the statute instead reasonably reflects the fact that the consequences of sexual intercourse and pregnancy fall more heavily on the female than on the male.

Accordingly the judgment of the California Supreme Court is

*Affirmed.*

JUSTICE STEWART, concurring.

Section 261.5, on its face, classifies on the basis of sex. A male who engages in sexual intercourse with an underage female who is not his wife violates the statute; a female who engages in sexual intercourse with an underage male who is not her husband does not.[1] The petitioner contends that this state law, which punishes only males for the conduct in question, violates his Fourteenth Amendment right to the equal protection of the law. The Court today correctly rejects that contention.

A

At the outset, it should be noted that the statutory discrimination, when viewed as part of the wider scheme of California law, is not as clearcut as might at first appear. Females are not freed from criminal liability in California for engaging in sexual activity that may be harmful. It is unlawful, for example, for any person, of either sex, to molest, annoy, or contribute to the delinquency of anyone under 18 years of

---

[1] But see n. 5 and accompanying text, *infra.*

age.[2] All persons are prohibited from committing "any lewd or lascivious act," including consensual intercourse, with a child under 14.[3] And members of both sexes may be convicted for engaging in deviant sexual acts with anyone under 18.[4] Finally, females may be brought within the proscription of § 261.5 itself, since a female may be charged with aiding and abetting its violation.[5]

Section 261.5 is thus but one part of a broad statutory scheme that protects all minors from the problems and risks attendant upon adolescent sexual activity. To be sure, § 261.5 creates an additional measure of punishment for males who engage in sexual intercourse with females between the ages of 14 and 17.[6] The question then is whether the Constitution prohibits a state legislature from imposing this *additional* sanction on a gender-specific basis.

## B

The Constitution is violated when government, state or federal, invidiously classifies similarly situated people on the basis of the immutable characteristics with which they were

---

[2] See Cal. Penal Code Ann. §§ 272, 647a (West Supp. 1981).

[3] Cal. Penal Code Ann. § 288 (West Supp. 1981). See *People* v. *Dontanville,* 10 Cal. App. 3d 783, 796, 89 Cal. Rptr. 172, 180 (2d Dist.).

[4] See Cal. Penal Code Ann. §§ 286 (b)(1), 288a (b)(1) (West Supp. 1981).

[5] See Cal. Penal Code Ann. § 31 (West 1970); *People* v. *Haywood,* 131 Cal. App. 2d 259, 280 P. 2d 180 (2d Dist.); *People* v. *Lewis,* 113 Cal. App. 2d 468, 248 P. 2d 461 (1st Dist.). According to statistics maintained by the California Department of Justice Bureau of Criminal Statistics, approximately 14% of the juveniles arrested for participation in acts made unlawful by § 261.5 between 1975 and 1979 were females. Moreover, an underage female who is *as* culpable as her male partner, or more culpable, may be prosecuted as a juvenile delinquent. Cal. Welf. & Inst. Code Ann. § 602 (West Supp. 1981); *In re Gladys R.,* 1 Cal. 3d 855, 867–869, 464 P. 2d 127, 136–138.

[6] Males and females are equally prohibited by § 288 from sexual intercourse with minors under 14. Compare Cal. Penal Code Ann. § 288 (West Supp. 1981) with Cal. Penal Code Ann. §§ 18, 264 (West Supp. 1981).

born. · Thus, detrimental racial classifications by government always violate the Constitution, for the simple reason that, so far as the Constitution is concerned, people of different races are always similarly situated. See *Fullilove* v. *Klutznick,* 448 U. S. 448, 522 (dissenting opinion); *McLaughlin* v. *Florida,* 379 U. S. 184, 198 (concurring opinion); *Brown* v. *Board of Ed.,* 347 U. S. 483; *Plessy* v. *Ferguson,* 163 U. S. 537, 552 (dissenting opinion). By contrast, while detrimental gender classifications by government often violate the Constitution, they do not always do so, for the reason that there are differences between males and females that the Constitution necessarily recognizes. In this case we deal with the most basic of these differences: females can become pregnant as the result of sexual intercourse; males cannot.

As was recognized in *Parham* v. *Hughes,* 441 U. S. 347, 354, "a State is not free to make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class." Gender-based classifications may not be based upon administrative convenience, or upon archaic assumptions about the proper roles of the sexes. *Craig* v. *Boren,* 429 U. S. 190; *Frontiero* v. *Richardson,* 411 U. S. 677; *Reed* v. *Reed,* 404 U. S. 71. But we have recognized that in certain narrow circumstances men and women are *not* similarly situated; in these circumstances a gender classification based on clear differences between the sexes is not invidious, and a legislative classification realistically based upon those differences is not unconstitutional. See *Parham* v. *Hughes, supra; Califano* v. *Webster,* 430 U. S. 313, 316–317; *Schlesinger* v. *Ballard,* 419 U. S. 498; cf. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 59 (concurring opinion). "[G]ender-based classifications are not invariably invalid. When men and women are not in fact similarly situated in the area covered by the legislation in question, the Equal Protection Clause is not violated." *Caban* v. *Mohammed,* 441 U. S. 380, 398 (dissenting opinion).

Applying these principles to the classification enacted by the California Legislature, it is readily apparent that § 261.5 does not violate the Equal Protection Clause. Young women and men are not similarly situated with respect to the problems and risks associated with intercourse and pregnancy, and the statute is realistically related to the legitimate state purpose of reducing those problems and risks.

## C

As the California Supreme Court's catalog shows, the pregnant unmarried female confronts problems more numerous and more severe than any faced by her male partner.[7] She alone endures the medical risks of pregnancy or abortion.[8] She suffers disproportionately the social, educational, and emotional consequences of pregnancy.[9] Recognizing this dis-

---

[7] The court noted that from 1971 through 1976, 83.6% of the 4,860 children born to girls under 15 in California were illegitimate, as were 51% of those born to girls 15 to 17. The court also observed that while accounting for only 21% of California pregnancies in 1976, teenagers accounted for 34.7% of legal abortions. See *ante*, at 470, n. 3.

[8] There is also empirical evidence that sexual abuse of young females is a more serious problem than sexual abuse of young males. For example, a review of five studies found that 88% of sexually abused minors were female. Jaffe, Dynneson, & ten Bensel, Sexual Abuse of Children 129 Am. J. of Diseases of Children 689, 690 (1975). Another study, involving admissions to a hospital emergency room over a 3-year period, reported that 86 of 100 children examined for sexual abuse were girls. Orr & Prietto, Emergency Management of Sexually Abused Children, 133 Am. J. of Diseased Children 630 (1979). See also *State* v. *Craig*, 169 Mont. 150, 156–157, 545 P. 2d 649, 653; Sarafino, An Estimate of Nationwide Incidence of Sexual Offenses Against Children, 58 Child Welfare 127, 131 (1979).

[9] Most teenage mothers do not finish high school and are disadvantaged economically thereafter. See Moore, Teenage Childbirth and Welfare Dependency, 10 Family Planning Perspectives 233–235 (1978). The suicide rate for teenage mothers is seven times greater than that for teenage girls without children. F. Nye, School-Age Parenthood (Wash. State U. Ext. Bull. No. 667) 8 (1976). And 60% of adolescent mothers aged 15 to 17

proportion, California has attempted to protect teenage females by prohibiting males from participating in the act necessary for conception.[10]

The fact that males and females are not similarly situated with respect to the risks of sexual intercourse applies with the same force to males under 18 as it does to older males. The risk of pregnancy is a significant deterrent for unwed young females that is not shared by unmarried males, regardless of their age. Experienced observation confirms the common-sense notion that adolescent males disregard the possibility of pregnancy far more than do adolescent females.[11] And to the extent that § 261.5 may punish males for intercourse with prepubescent females, that punishment is justifiable because of the substantial physical risks for prepubescent females that are not shared by their male counterparts.[12]

---

are on welfare within two to five years of the birth of their children. Teenage Pregnancy, Everybody's Problem 3–4 (DHEW Publication (HSA) No. 77–5619).

[10] Despite the increased availability of contraceptives and sex education, the pregnancy rates for young women are increasing. See Alan Guttmacher Institute, 11 Million Teenagers 12 (1976). See generally C. Chilman, Adolescent Sexuality in a Changing American Society (NIH Pub. No. 80–1426, 1980).

The petitioner contends that the statute is overinclusive because it does not allow a defense that contraceptives were used, or that procreation was for some other reason impossible. The petitioner does not allege, however, that he used a contraceptive, or that pregnancy could not have resulted from the conduct with which he was charged. But even assuming the petitioner's standing to raise the claim of overbreadth, it is clear that a statute recognizing the defenses he suggests would encounter difficult if not impossible problems of proof.

[11] See, e. g., Phipps-Yonas, Teenage Pregnancy and Motherhood, 50 Am. J. Orthopsychiatry 403, 412 (1980). See also State v. Rundlett, 391 A. 2d 815, 819, n. 13, 822 (Me.); Rundlett v. Oliver, 607 F. 2d 495, 502 (CA1).

[12] See Barnes v. State, 244 Ga. 302, 260 S. E. 2d 40; see generally Orr & Prietto, supra; Jaffee, Dynneson, & ten Bensel, supra; Chilman, supra.

## D

The petitioner argues that the California Legislature could have drafted the statute differently, so that its purpose would be accomplished more precisely. "But the issue, of course, is not whether the statute could have been drafted more wisely, but whether the lines chosen by the . . . [l]egislature are within constitutional limitations." *Kahn* v. *Shevin,* 416 U. S. 351, 356, n. 10. That other States may have decided to attack the same problems more broadly, with gender-neutral statutes, does not mean that every State is constitutionally compelled to do so.[13]

## E

In short, the Equal Protection Clause does not mean that the physiological differences between men and women must be disregarded. While those differences must never be permitted to become a pretext for invidious discrimination, no such discrimination is presented by this case. The Constitution surely does not require a State to pretend that demonstrable differences between men and women do not really exist.

JUSTICE BLACKMUN, concurring in the judgment.

It is gratifying that the plurality recognizes that "[a]t the risk of stating the obvious, teenage pregnancies . . . have increased dramatically over the last two decades" and "have significant social, medical, and economic consequences for both

---

[13] The fact is that a gender-neutral statute would not necessarily lead to a closer fit with the aim of reducing the problems associated with teenage pregnancy. If both parties were equally liable to prosecution, a female would be far less likely to complain; the very complaint would be self-incriminating. Accordingly, it is possible that a gender-neutral statute would result in fewer prosecutions than the one before us.

In any event, a state legislature is free to address itself to what it believes to be the most serious aspect of a broader problem. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge* v. *Williams,* 397 U. S. 471, 486–487; see also *Williamson* v. *Lee Optical Co.,* 348 U. S. 483.

the mother and her child, and the State." *Ante,* at 470 (foot-notes omitted). There have been times when I have won-dered whether the Court was capable of this perception, par-ticularly when it has struggled with the different but not unrelated problems that attend abortion issues. See, for ex-ample, the opinions (and the dissenting opinions) in *Beal* v. *Doe,* 432 U. S. 438 (1977); *Maher* v. *Roe,* 432 U. S. 464 (1977); *Poelker* v. *Doe,* 432 U. S. 519 (1977); *Harris* v. *McRae,* 448 U. S. 297 (1980); *Williams* v. *Zbaraz,* 448 U. S. 358 (1980); and today's opinion in *H. L.* v. *Matheson, ante,* p. 389.

Some might conclude that the two uses of the criminal sanction—here flatly to forbid intercourse in order to fore-stall teenage pregnancies, and in *Matheson* to prohibit a physician's abortion procedure except upon notice to the parents of the pregnant minor—are vastly different proscrip-tions. But the basic social and privacy problems are much the same. Both Utah's statute in *Matheson* and California's statute in this case are legislatively created tools intended to achieve similar ends and addressed to the same societal con-cerns: the control and direction of young people's sexual ac-tivities. The plurality opinion impliedly concedes as much when it notes that "approximately half of all teenage preg-nancies end in abortion," and that "those children who are born" are "likely candidates to become wards of the State," *Ante,* at 471, and n. 6.

I, however, cannot vote to strike down the California stat-utory rape law, for I think it is a sufficiently reasoned and constitutional effort to control the problem at its inception. For me, there is an important difference between this state action and a State's adamant and rigid refusal to face, or even to recognize, the "significant . . . consequences"—to the woman—of a forced or unwanted conception. I have found it difficult to rule constitutional, for example, state efforts to block, at that later point, a woman's attempt to deal with the enormity of the problem confronting her, just as I have rejected state efforts to prevent women from rationally tak-

ing steps to prevent that problem from arising. See, *e. g.,* *Carey* v. *Population Services International,* 431 U. S. 678 (1977). See also *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). In contrast, I am persuaded that, although a minor has substantial privacy rights in intimate affairs connected with procreation, California's efforts to prevent teenage pregnancy are to be viewed differently from Utah's efforts to inhibit a woman from dealing with pregnancy once it has become an inevitability.

*Craig* v. *Boren,* 429 U. S. 190 (1976), was an opinion which, in large part, I joined, *id.,* at 214. The plurality opinion in the present case points out, *ante,* at 468–469, the Court's respective phrasings of the applicable test in *Reed* v. *Reed,* 404 U. S. 71, 76 (1971), and in *Craig* v. *Boren,* 429 U. S., at 197. I vote to affirm the judgment of the Supreme Court of California and to uphold the State's gender-based classification on that test and as exemplified by those two cases and by *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975); and *Kahn* v. *Shevin,* 416 U. S. 351 (1974).

I note, also, that § 261.5 of the California Penal Code is just one of several California statutes intended to protect the juvenile. JUSTICE STEWART, in his concurring opinion, appropriately observes that § 261.5 is "but one part of a broad statutory scheme that protects all minors from the problems and risks attendant upon adolescent sexual activity." *Ante,* at 477.

I think, too, that it is only fair, with respect to this particular petitioner, to point out that his partner, Sharon, appears not to have been an unwilling participant in at least the initial stages of the intimacies that took place the night of June 3, 1978.* Petitioner's and Sharon's nonacquaintance

---

*Sharon at the preliminary hearing testified as follows:

"Q [by the Deputy District Attorney]. On June the 4th, at approximately midnight—midnight of June the 3rd, were you in Rohnert Park?

with each other before the incident; their drinking; their withdrawal from the others of the group; their foreplay, in which she willingly participated and seems to have encour-

"A [by Sharon]. Yes.

"Q. Is that in Sonoma County?

"A. Yes.

"Q. Did anything unusual happen to you that night in Rohnert Park?

"A. Yes.

"Q. Would you briefly describe what happened that night? Did you see the defendant that night in Rohnert Park?

"A. Yes.

"Q. Where did you first meet him?

"A. At a bus stop.

"Q. Was anyone with you?

"A. My sister.

"Q. Was anyone with the defendant?

"A. Yes.

"Q. How many people were with the defendant?

"A. Two.

"Q. Now, after you met the defendant, what happened?

"A. We walked down to the railroad tracks.

"Q. What happened at the railroad tracks?

"A. We were drinking at the railroad tracks and we walked over to this bush and he started kissing me and stuff, and I was kissing him back, too, at first. Then, I was telling him to stop—

"Q. Yes.

"A. —and I was telling him to slow down and stop. He said, 'Okay, okay.' But then he just kept doing it. He just kept doing it and then my sister and two other guys came over to where we were and my sister said—told me to get up and come home. And then I didn't—

"Q. Yes.

"A. —and then my sister and—

"Q. All right.

"A. —David, one of the boys that were there, started walking home and we stayed there and then later—

"Q. All right.

"A. —Bruce left Michael, you know.

"The Court: Michael being the defendant?

"The Witness: Yeah. We was laying there and we were kissing each other, and then he asked me if I wanted to walk him over to the park; so we walked over to the park and we sat down on a bench and then he

aged; and the closeness of their ages (a difference of only one year and 18 days) are factors that should make this case an unattractive one to prosecute at all, and especially to pros-

started kissing me again and we were laying on the bench. And he told me to take my pants off.

"I said, 'No,' and I was trying to get up and he hit me back down on the bench and then I just said to myself, 'Forget it,' and I let him do what he wanted to do and he took my pants off and he was telling me to put my legs around him and stuff—

.    .    .    .    .

"Q. Did you have sexual intercourse with the defendant?

"A. Yeah.

"Q. He did put his penis into your vagina?

"A. Yes.

"Q. You said that he hit you?

"A. Yeah.

"Q. How did he hit you?

"A. He slugged me in the face.

"Q. With what did he slug you?

"A. His fist.

"Q. Where abouts in the face?

"A. On my chin.

"Q. As a result of that, did you have any bruises or any kind of an injury?

"A. Yeah.

"Q. What happened?

"A. I had bruises.

"The Court: Did he hit you one time or did he hit you more than once?

"The Witness: He hit me about two or three times.

.    .    .    .    .

"Q. Now, during the course of that evening, did the defendant ask you your age?

"A. Yeah.

"Q. And what did you tell him?

"A. Sixteen.

"Q. Did you tell him you were sixteen?

"A. Yes.

"Q. Now, you said you had been drinking, is that correct?

"A. Yes.

"Q. Would you describe your condition as a result of the drinking?

486

ecute as a felony, rather than as a misdemeanor chargeable under § 261.5. But the State has chosen to prosecute in that

---

"A. I was a little drunk." App. 20–23.

CROSS-EXAMINATION

"Q. Did you go off with Mr. *M.* away from the others?

"A. Yeah.

"Q. Why did you do that?

"A. I don't know. I guess I wanted to.

"Q. Did you have any need to go to the bathroom when you were there.

"A. Yes.

"Q. And what did you do?

"A. Me and my sister walked down the railroad tracks to some bushes and went to the bathroom.

"Q. Now, you and Mr. *M.*, as I understand it, went off into the bushes, is that correct?

"A. Yes.

"Q. Okay. And what did you do when you and Mr. *M.* were there in the bushes?

"A. We were kissing and hugging.

"Q. Were you sitting up?

"A. We were laying down.

"Q. You were lying down. This was in the bushes?

"A. Yes.

"Q. How far away from the rest of them were you?

"A. They were just bushes right next to the railroad tracks. We just walked off into the bushes; not very far.

. . . . .

"Q. So your sister and the other two boys came over to where you were, you and Michael were, is that right?

"A. Yeah.

"Q. What did they say to you, if you remember?

"A. My sister didn't say anything. She said, 'Come on, Sharon, let's go home.'

"Q. She asked you to go home with her?

"A. (Affirmative nod.)

"Q. Did you go home with her?

"A. No.

"Q. You wanted to stay with Mr. *M.*?

"A. I don't know.

"Q. Was this before or after he hit you?

manner, and the facts, I reluctantly conclude, may fit the crime.

"A. Before.

⸱　　　　⸱　　　　⸱　　　　⸱

"Q. What happened in the five minutes that Bruce stayed there with you and Michael?
"A. I don't remember.
"Q. You don't remember at all?
"A. (Negative head shake.)
"Q. Did you have occasion at that time to kiss Bruce?
"A. Yeah.
"Q. You did? You were kissing Bruce at that time?
"A. (Affirmative nod.)
"Q. Was Bruce kissing you?
"A. Yes.
"Q. And were you standing up at this time?
"A. No, we were sitting down.

⸱　　　　⸱　　　　⸱　　　　⸱

"Q. Okay. So at this point in time you had left Mr. *M.* and you were hugging and kissing with Bruce, is that right?
"A. Yeah.
"Q. And you were sitting up.
"A. Yes.
"Q. Was your sister still there then?
"A. No. Yeah, she was at first.
"Q. What was she doing?
"A. She was standing up with Michael and David.
"Q. Yes. Was she doing anything with Michael and David?
"A. No, I don't think so.
"Q. Whose idea was it for you and Bruce to kiss? Did you initiate that?
"A. Yes.
"Q. What happened after Bruce left?
"A. Michael asked me if I wanted to go walk to the park.
"Q. And what did you say?
"A. I said, 'Yes.'
"Q. And then what happened?
"A. We walked to the park.

⸱　　　　⸱　　　　⸱　　　　⸱

"Q. How long did it take you to get to the park?
"A. About ten or fifteen minutes.

JUSTICE BRENNAN, with whom JUSTICES WHITE and MARSHALL join, dissenting.

## I

It is disturbing to find the Court so splintered on a case that presents such a straightforward issue: Whether the admittedly gender-based classification in Cal. Penal Code Ann. § 261.5 (West Supp. 1981) bears a sufficient relationship to the State's asserted goal of preventing teenage pregnancies to survive the "mid-level" constitutional scrutiny mandated by *Craig* v. *Boren,* 429 U. S. 190 (1976).[1] Applying the analytical framework provided by our precedents, I am convinced that there is only one proper resolution of this issue: the classification must be declared unconstitutional. I fear that the plurality opinion and JUSTICES STEWART and BLACKMUN reach the opposite result by placing too much emphasis on the desirability of achieving the State's asserted statutory goal—prevention of teenage pregnancy—and not enough emphasis on the fundamental question of whether the sex-based discrim-

---

"Q. And did you walk there?

"A. Yes.

"Q. Did Mr. *M.* ever mention his name?

"A. Yes." *Id.,* at 27–32.

[1] The California Supreme Court acknowledged, and indeed the parties do not dispute, that Cal. Penal Code Ann. § 261.5 (West Supp. 1981) discriminates on the basis of sex. *Ante,* at 467. Because petitioner is male, he faces criminal felony charges and a possible prison term while his female partner remains immune from prosecution. The gender of the participants, not their relative responsibility, determines which of them is subject to criminal sanctions under § 261.5.

As the California Supreme Court stated in *People* v. *Hernandez,* 61 Cal. 2d 529, 531, 393 P. 2d 673, 674 (1964) (footnote omitted):

"[E]ven in circumstances where a girl's actual comprehension contradicts the law's presumption [that a minor female is too innocent and naive to understand the implications and nature of her act], the male is deemed criminally responsible for the act, although himself young and naive and responding to advances which may have been made to him."

ination in the California statute is *substantially* related to the achievement of that goal.[2]

## II

After some uncertainty as to the proper framework for analyzing equal protection challenges to statutes containing gender-based classifications, see *ante,* at 468, this Court settled upon the proposition that a statute containing a gender-based classification cannot withstand constitutional challenge unless

---

[2] None of the three opinions upholding the California statute fairly applies the equal protection analysis this Court has so carefully developed since *Craig* v. *Boren,* 429 U. S. 190 (1976). The plurality opinion, for example, focusing on the obvious and uncontested fact that only females can become pregnant, suggests that the statutory gender discrimination, rather than being invidious, actually ensures equality of treatment. Since only females are subject to a risk of pregnancy, the plurality opinion concludes that "[a] criminal sanction imposed solely on males . . . serves to roughly 'equalize' the deterrents on the sexes." *Ante,* at 473. JUSTICE STEWART adopts a similar approach. Recognizing that "females can become pregnant as the result of sexual intercourse; males cannot," JUSTICE STEWART concludes that "[y]oung women and men are not similarly situated with respect to the problems and risks associated with intercourse and pregnancy," and therefore § 261.5 "is *realistically* related to the legitimate state purpose of reducing those problems and risks" (emphasis added). *Ante,* at 478, 479. JUSTICE BLACKMUN, conceding that some limits must be placed on a State's power to regulate "the control and direction of young people's sexual activities," also finds the statute constitutional. *Ante,* at 482. He distinguishes the State's power in the abortion context, where the pregnancy has already occurred, from its power in the present context, where the "problem [is] at its inception." He then concludes, without explanation, that "the California statutory rape law . . . is a sufficiently reasoned and constitutional effort to control the problem at its inception." *Ibid.*

All three of these approaches have a common failing. They overlook the fact that the State has not met its burden of proving that the gender discrimination in § 261.5 is *substantially* related to the achievement of the State's asserted statutory goal. My Brethren seem not to recognize that California has the burden of proving that a gender-neutral statutory rape law would be less effective than § 261.5 in deterring sexual activity leading to teenage pregnancy. Because they fail to analyze the issue in these terms, I believe they reach an unsupportable result.

490

the classification is substantially related to the achievement of an important governmental objective. *Kirchberg* v. *Feenstra, ante,* at 459; *Wengler* v. *Druggists Mutual Ins. Co.,* 446 U. S. 142, 150 (1980); *Califano* v. *Westcott,* 443 U. S. 76, 85 (1979); *Caban* v. *Mohammed,* 441 U. S. 380, 388 (1979); *Orr* v. *Orr,* 440 U. S. 268, 279 (1979); *Califano* v. *Goldfarb,* 430 U. S. 199, 210–211 (1977); *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977); *Craig* v. *Boren, supra,* at 197. This analysis applies whether the classification discriminates against males or against females. *Caban* v. *Mohammed, supra,* at 394; *Orr* v. *Orr, supra,* at 278–279; *Craig* v. *Boren, supra,* at 204. The burden is on the government to prove both the importance of its asserted objective and the substantial relationship between the classification and that objective. See *Kirchberg* v. *Feenstra, ante,* at 461; *Wengler* v. *Druggists Mutual Ins. Co., supra,* at 151–152; *Caban* v. *Mohammed, supra,* at 393; *Craig* v. *Boren, supra,* at 204. And the State cannot meet that burden without showing that a gender-neutral statute would be a less effective means of achieving that goal. *Wengler* v. *Druggists Mutual Ins. Co., supra,* at 151–152; *Orr* v. *Orr, supra,* at 281, 283.[3]

The State of California vigorously asserts that the "important governmental objective" to be served by § 261.5 is the prevention of teenage pregnancy. It claims that its statute furthers this goal by deterring sexual activity by males—the class of persons it considers more responsible for causing those pregnancies.[4] But even assuming that prevention of teenage

[3] Gender-based statutory rape laws were struck down in *Navedo* v. *Preisser,* 630 F. 2d 636 (CA8 1980), *United States* v. *Hicks,* 625 F. 2d 216 (CA9 1980), and *Meloon* v. *Helgemoe,* 564 F. 2d 602 (CA1 1977), cert. denied, 436 U. S. 950 (1978), precisely because the government failed to meet this burden of proof.

[4] In a remarkable display of sexual stereotyping, the California Supreme Court stated:

"The Legislature is well within its power in imposing criminal sanctions against males, alone, because they are the *only* persons who may physio-

pregnancy is an important governmental objective and that it is in fact an objective of § 261.5, see *infra,* at 494–496, California still has the burden of proving that there are fewer teenage pregnancies under its gender-based statutory rape law than there would be if the law were gender neutral. To meet this burden, the State must show that because its statutory rape law punishes only males, and not females, it more effectively deters minor females from having sexual intercourse.[5]

The plurality assumes that a gender-neutral statute would be less effective than § 261.5 in deterring sexual activity because a gender-neutral statute would create significant enforcement problems. The plurality thus accepts the State's assertion that

"a female is surely less likely to report violations of the statute if she herself would be subject to criminal prose-

---

logically cause the result which the law properly seeks to avoid." 25 Cal. 3d 608, 612, 601 P. 2d 572, 575 (1979) (emphasis in original).

[5] Petitioner has not questioned the State's constitutional power to achieve its asserted objective by criminalizing consensual sexual activity. However, I note that our cases would not foreclose such a privacy challenge.

The State is attempting to reduce the incidence of teenage pregnancy by imposing criminal sanctions on those who engage in consensual sexual activity with minor females. We have stressed, however, that

"[i]f the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt* v. *Baird,* 405 U. S. 438, 453 (1972) (footnote omitted).

Minors, too, enjoy a right of privacy in connection with decisions affecting procreation. *Carey* v. *Population Services International,* 431 U. S. 678, 693 (1977). Thus, despite the suggestion of the plurality to the contrary, *ante,* at 472–473, n. 8, it is not settled that a State may rely on a pregnancy-prevention justification to make consensual sexual intercourse among minors a criminal act.

cution. In an area already fraught with prosecutorial difficulties, we decline to hold that the Equal Protection Clause requires a legislature to enact a statute so broad that it may well be incapable of enforcement." *Ante,* at 473–474 (footnotes omitted).

However, a State's bare assertion that its gender-based statutory classification substantially furthers an important governmental interest is not enough to meet its burden of proof under *Craig* v. *Boren.* Rather, the State must produce evidence that will persuade the court that its assertion is true. See *Craig* v. *Boren,* 429 U. S., at 200–204.

The State has not produced such evidence in this case. Moreover, there are at least two serious flaws in the State's assertion that law enforcement problems created by a gender-neutral statutory rape law would make such a statute less effective than a gender-based statute in deterring sexual activity.

First, the experience of other jurisdictions, and California itself, belies the plurality's conclusion that a gender-neutral statutory rape law "may well be incapable of enforcement." There are now at least 37 States that have enacted gender-neutral statutory rape laws. Although most of these laws protect young persons (of either sex) from the sexual exploitation of older individuals, the laws of Arizona, Florida, and Illinois permit prosecution of both minor females and minor males for engaging in mutual sexual conduct.[6] California has introduced no evidence that those States have been handi-

---

[6] See·Ariz. Rev. Stat. Ann. § 13–1405 (1978); Fla. Stat. § 794.05 (1979); Ill. Rev. Stat., ch. 38, ¶ 11–5 (1979). In addition, eight other States permit both parties to be prosecuted when one of the participants to a consensual act of sexual intercourse is under the age of 16. See Kan. Stat. Ann. § 21–3503 (1974); Mass. Gen. Laws Ann., ch. 265, § 23 (West Supp. 1981); Mich. Comp. Laws § 750.13 (1970); Mont. Code Ann. §§ 45–5–501 to 45–5–503 (1979); N. H. Rev. Stat. § 632–A:3 (Supp. 1979); Tenn. Code Ann. § 39–3705 (4) (Supp. 1979); Utah Code Ann. ·§ 76–5–401 (Supp. 1979); Vt. Stat. Ann., Tit. 13, § 3252 (3) (Supp. 1980).

capped by the enforcement problems the plurality finds so persuasive.[7] Surely, if those States could provide such evidence, we might expect that California would have introduced it.

In addition, the California Legislature in recent years has revised other sections of the Penal Code to make them gender-neutral. For example, Cal. Penal Code Ann. §§ 286 (b)(1) and 288a (b)(1) (West Supp. 1981), prohibiting sodomy and oral copulation with a "person who is under 18 years of age," could cause two minor homosexuals to be subjected to criminal sanctions for engaging in mutually consensual conduct. Again, the State has introduced no evidence to explain why a gender-neutral statutory rape law would be any more difficult to enforce than those statutes.

The second flaw in the State's assertion is that even assuming that a gender-neutral statute would be more difficult to enforce, the State has still not shown that those enforcement problems would make such a statute less effective than a gender-based statute in deterring minor females from engaging in sexual intercourse.[8] Common sense, however, suggests

---

[7] There is a logical reason for this. In contrast to laws governing forcible rape, statutory rape laws apply to consensual sexual activity. Force is not an element of the crime. Since a woman who consents to an act of sexual intercourse is unlikely to report her partner to the police—whether or not she is subject to criminal sanctions—enforcement would not be undermined if the statute were to be made gender neutral. See n. 8, *infra*.

[8] As it is, § 261.5 seems to be an ineffective deterrent of sexual activity. Cf. *Carey v. Population Services International, supra,* at 695 (substantial reason to doubt that limiting access to contraceptives will substantially discourage early sexual behavior). According to statistics provided by the State, an average of only 61 juvenile males and 352 adult males were arrested for statutory rape each year between 1975 and 1978. Brief for Respondent 19. During each of those years there were approximately one million Californian girls between the ages of 13–17. Cal. Dept. of Finance, Population Projections for California Counties, 1975–2020, with Age/Sex Detail to 2000, Series E–150 (1977). Although the record in this case

that a gender-neutral statutory rape law is potentially a *greater* deterrent of sexual activity than a gender-based law, for the simple reason that a gender-neutral law subjects both men and women to criminal sanctions and thus arguably has a deterrent effect on twice as many potential violators. Even if fewer persons were prosecuted under the gender-neutral law, as the State suggests, it would still be true that twice as many persons would be *subject* to arrest. The State's failure to prove that a gender-neutral law would be a less effective deterrent than a gender-based law, like the State's failure to prove that a gender-neutral law would be difficult to enforce, should have led this Court to invalidate § 261.5.

## III

Until very recently, no California court or commentator had suggested that the purpose of California's statutory rape law was to protect young women from the risk of pregnancy. Indeed, the historical development of § 261.5 demonstrates that the law was initially enacted on the premise that young women, in contrast to young men, were to be deemed legally incapable of consenting to an act of sexual intercourse.[9] Be-

---

does not indicate the incidence of sexual intercourse involving those girls during that period, the California State Department of Health estimates that there were almost 50,000 pregnancies among 13-to-17-year-old girls during 1976. Cal. Dept. of Health, Birth and Abortion Records, and Physician Survey of Office Abortions (1976). I think it is fair to speculate from this evidence that a comparison of the number of arrests for statutory rape in California with the number of acts of sexual intercourse involving minor females in that State would likely demonstrate to a male contemplating sexual activity with a minor female that his chances of being arrested are reassuringly low. I seriously question, therefore, whether § 261.5 as enforced has a substantial deterrent effect. See *Craig* v. *Boren*, 429 U. S., at 214 (STEVENS, J., concurring).

[9] California's statutory rape law had its origins in the Statutes of Westminster enacted during the reign of Edward I at the close of the 13th century (3 Edw. 1, ch. 13 (1275); 13 Edw. 1, ch. 34 (1285)). The age of consent at that time was 12 years, reduced to 10 years in 1576 (18

cause their chastity was considered particularly precious, those young women were felt to be uniquely in need of the State's protection.[10]   In contrast, young men were assumed to

Eliz. 1, ch. 7, § 4).   This statute was part of the common law brought to the United States.   Thus, when the first California penal statute was enacted, it contained a provision (1850 Cal. Stats., ch. 99, § 47, p. 234) that proscribed sexual intercourse with females under the age of 10.   In 1889, the California statute was amended to make the age of consent 14 (1889 Cal. Stats., ch. 191, § 1, p. 223).   In 1897, the age was advanced to 16 (1897 Cal. Stats., ch. 139, § 1, p. 201).   In 1913 it was fixed at 18, where it now remains (1913 Cal. Stats., ch. 122, § 1, p. 212).

Because females generally have not reached puberty by the age of 10, it is inconceivable that a statute designed to prevent pregnancy would be directed at acts of sexual intercourse with females under that age.

The only legislative history available, the draftsmen's notes to the Penal Code of 1872, supports the view that the purpose of California's statutory rape law was to protect those who were too young to give consent.   The draftsmen explained that the "[statutory rape] provision embodies the well settled rule of the existing law; that a girl under ten years of age is incapable of giving any consent to an act of intercourse which can reduce it below the grade of rape."   Code Commissioners' note, subd. 1, following Cal. Penal Code § 261, p. 111 (1st ed. 1872).   There was no mention whatever of pregnancy prevention.   See also Note, Forcible and Statutory Rape: An Exploration of the Operation and Objectives of the Consent Standard, 62 Yale L. J. 55, 74–76 (1952).

[10] Past decisions of the California courts confirm that the law was designed to protect the State's young females from their own uninformed decisionmaking.   In *People* v. *Verdegreen,* 106 Cal. 211, 214–215, 39 P. 607, 608–609 (1895), for example, the California Supreme Court stated:

"The obvious purpose of [the statutory rape law] is the protection of society by protecting from violation the virtue of young and unsophisticated girls. . . .   It is the insidious approach and vile tampering with their persons that primarily undermines the virtue of young girls, and eventually destroys it; and the prevention of this, as much as the principal act, must undoubtedly have been the intent of the legislature."

As recently as 1964, the California Supreme Court decided *People* v. *Hernandez,* 61 Cal. 2d, at 531, 393 P. 2d, at 674, in which it stated that the under-age female

"is presumed too innocent and naive to understand the implications and nature of her act. . . .   The law's concern with her capacity or lack thereof

be capable of making such decisions for themselves; the law therefore did not offer them any special protection.

It is perhaps because the gender classification in California's statutory rape law was initially designed to further these outmoded sexual stereotypes, rather than to reduce the incidence of teenage pregnancies, that the State has been unable to demonstrate a substantial relationship beween the classification and its newly asserted goal. Cf. *Califano* v. *Goldfarb,* 430 U. S., at 223 (STEVENS, J., concurring in judgment). But whatever the reason, the State has not shown that Cal. Penal Code § 261.5 is any more effective than a gender-neutral law would be in deterring minor females from engaging in sexual intercourse. It has therefore not met its burden of proving that the statutory classification is substantially related to the achievement of its asserted goal.

I would hold that § 261.5 violates the Equal Protection Clause of the Fourteenth Amendment, and I would reverse the judgment of the California Supreme Court.

JUSTICE STEVENS, dissenting.

Local custom and belief—rather than statutory laws of venerable but doubtful ancestry—will determine the volume of sexual activity among unmarried teenagers.[1] The empiri-

---

to so understand is explained in part by a popular conception of the social, moral and personal values which are preserved by the abstinence from sexual indulgence on the part of a young woman. An unwise disposition of her sexual favor is deemed to do harm both to herself and the social mores by which the community's conduct patterns are established. Hence the law of statutory rape intervenes in an effort to avoid such a disposition."

It was only in deciding *Michael M.* that the California Supreme Court decided, for the first time in the 130-year history of the statute, that pregnancy prevention had become one of the purposes of the statute.

[1] "Common sense indicates that many young people will engage in sexual activity regardless of what the New York Legislature does; and further, that the incidence of venereal disease and premarital pregnancy is affected by the availability or unavailability of contraceptives. Although

cal evidence cited by the plurality demonstrates the futility of the notion that a statutory prohibition will significantly affect the volume of that activity or provide a meaningful solution to the problems created by it.[2]   Nevertheless, as a matter of constitutional power, unlike my Brother BRENNAN, see *ante*, at 491, n. 5, I would have no doubt about the validity of a state law prohibiting all unmarried teenagers from engaging in sexual intercourse.   The societal interests in reducing the incidence of venereal disease and teenage pregnancy are sufficient, in my judgment, to justify a prohibition of conduct that increases the risk of those harms.[3]

My conclusion that a nondiscriminatory prohibition would be constitutional does not help me answer the question whether a prohibition applicable to only half of the joint participants in the risk-creating conduct is also valid.   It cannot be true that the validity of a total ban is an adequate justification for a selective prohibition; otherwise, the constitutional objection to discriminatory rules would be meaningless.   The question in this case is whether the difference between males and females justifies this statutory discrimination based entirely on sex.[4]

---

young persons theoretically may avoid those harms by practicing total abstention, inevitably many will not." *Carey* v. *Population Services International*, 431 U. S. 678, 714 (STEVENS, J., concurring in part and in judgment).

[2] If a million teenagers became pregnant in 1976, see *ante*, at 470, n. 3, there must be countless violations of the California statute.   The statistics cited by JUSTICE BRENNAN also indicate, as he correctly observes, that the statute "seems to be an ineffective deterrent of sexual activity."   See *ante*, at 493–494, n. 8.

[3] See *Carey* v. *Population Services International, supra,* at 713 (STEVENS, J., concurring in part and in judgment).

[4] Equal protection analysis is often said to involve different "levels of scrutiny."   It may be more accurate to say that the burden of sustaining an equal protection challenge is much heavier in some cases than in others. Racial classifications, which are subjected to "strict scrutiny," are presumptively invalid because there is seldom, if ever, any legitimate reason for treating citizens differently because of their race.   On the other hand,

The fact that the Court did not immediately acknowledge that the capacity to become pregnant is what primarily differentiates the female from the male [5] does not impeach the validity of the plurality's newly found wisdom. I think the plurality is quite correct in making the assumption that the joint act that this law seeks to prohibit creates a greater risk of harm for the female than for the male. But the plurality surely cannot believe that the risk of pregnancy confronted by the female—any more than the risk of venereal disease confronted by males as well as females—has provided an effective deterrent to voluntary female participation in the risk-creating conduct. Yet the plurality's decision seems to rest on the assumption that the California Legislature acted on the basis of that rather fanciful notion.

---

most economic classifications are presumptively valid because they are a necessary component of most regulatory programs. In cases involving discrimination between men and women, the natural differences between the sexes are sometimes relevant and sometimes wholly irrelevant. If those differences are obviously irrelevant, the discrimination should be treated as presumptively unlawful in the same way that racial classifications are presumptively unlawful. Cf. *Califano* v. *Goldfarb*, 430 U. S. 199, 223 (STEVENS, J., concurring in judgment). But if, as in this case, there is an apparent connection between the discrimination and the fact that only women can become pregnant, it may be appropriate to presume that the classification is lawful. This presumption, however, may be overcome by a demonstration that the apparent justification for the discrimination is illusory or wholly inadequate. Thus, instead of applying a "midlevel" form of scrutiny in all sex discrimination cases, perhaps the burden is heavier in some than in others. Nevertheless, as I have previously suggested, the ultimate standard in these, as in all other equal protection cases, is essentially the same. See *Craig* v. *Boren*, 429 U. S. 190, 211–212 (STEVENS, J., concurring). Professor Cox recently noted that however the level of scrutiny is described, in·the final analysis, "the Court is always deciding whether in its judgment the harm done to the disadvantaged class by the legislative classification is disproportionate to the public purposes the measure is likely to achieve." Cox, Book Review, 94 Harv. L. Rev. 700, 706 (1981).

[5] See *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 162 (STEVENS, J., dissenting).

In my judgment, the fact that a class of persons is especially vulnerable to a risk that a statute is designed to avoid is a reason for making the statute applicable to that class. The argument that a special need for protection provides a rational explanation for an exemption is one I simply do not comprehend.[6]

In this case, the fact that a female confronts a greater risk of harm than a male is a reason for applying the prohibition to her—not a reason for granting her a license to use her own judgment on whether or not to assume the risk. Surely, if we examine the problem from the point of view of society's interest in preventing the risk-creating conduct from occurring at all, it is irrational to exempt 50% of the potential violators. See dissent of JUSTICE BRENNAN, *ante,* at 493–494. And, if we view the government's interest as that of a *parens patriae* seeking to protect its subjects from harming themselves, the discrimination is actually perverse. Would a rational parent making rules for the conduct of twin children of opposite sex simultaneously forbid the son and authorize the daughter to engage in conduct that is especially harmful to the daughter? That is the effect of this statutory classification.

If pregnancy or some other special harm is suffered by one of the two participants in the prohibited act, that special harm no doubt would constitute a legitimate mitigating factor in deciding what, if any, punishment might be appropriate in a given case. But from the standpoint of fashioning a general preventive rule—or, indeed, in determining appropriate punishment when neither party in fact has suffered any spe-

---

[6] A hypothetical racial classification will illustrate my point. Assume that skin pigmentation provides some measure of protection against cancer caused by exposure to certain chemicals in the atmosphere and, therefore, that white employees confront a greater risk than black employees in certain industrial settings. Would it be rational to require black employees to wear protective clothing but to exempt whites from that requirement? It seems to me that the greater risk of harm to white workers would be a reason for including them in the requirement—not for granting them an exemption.

cial harm—I regard a total exemption for the members of the more endangered class as utterly irrational.

In my opinion, the only acceptable justification for a general rule requiring disparate treatment of the two participants in a joint act must be a legislative judgment that one is more guilty than the other. The risk-creating conduct that this statute is designed to prevent requires the participation of two persons—one male and one female.[7] In many situations it is probably true that one is the aggressor and the other is either an unwilling, or at least a less willing, participant in the joint act. If a statute authorized punishment of only one participant and required the prosecutor to prove that that participant had been the aggressor, I assume that the discrimination would be valid. Although the question is less clear, I also assume, for the purpose of deciding this case, that it would be permissible to punish only the male participant, if one element of the offense were proof that he had been the aggressor, or at least in some respects the more responsible participant in the joint act. The statute at issue in this case, however, requires no such proof. The question raised by this statute is whether the State, consistently with the Federal Constitution, may always punish the male and never the female when they are equally responsible or when the female is the more responsible of the two.

It would seem to me that an impartial lawmaker could give only one answer to that question. The fact that the California Legislature has decided to apply its prohibition only to

---

[7] In light of this indisputable biological fact, I find somewhat puzzling the California Supreme Court's conclusion, quoted by the plurality, *ante,* at 467, that males "are the *only* persons who may physiologically cause the result which the law properly seeks to avoid." 25 Cal. 3d 608, 612, 601 P. 2d 572, 575 (1979) (emphasis in original). Presumably, the California Supreme Court was referring to the equally indisputable biological fact that only females may become pregnant. However, if pregnancy results from sexual intercourse between two willing participants—and the California statute is directed at such conduct—I would find it difficult to conclude that the pregnancy was "caused" solely by the male participant.

the male may reflect a legislative judgment that in the typical case the male is actually the more guilty party. Any such judgment must, in turn, assume that the decision to engage in the risk-creating conduct is always—or at least typically—a male decision. If that assumption is valid, the statutory classification should also be valid. But what is the support for the assumption? It is not contained in the record of this case or in any legislative history or scholarly study that has been called to our attention. I think it is supported to some extent by traditional attitudes toward male-female relationships. But the possibility that such a habitual attitude may reflect nothing more than an irrational prejudice makes it an insufficient justification for discriminatory treatment that is otherwise blatantly unfair. For, as I read this statute, it requires that one, and only one, of two equally guilty wrongdoers be stigmatized by a criminal conviction.

I cannot accept the State's argument that the constitutionality of the discriminatory rule can be saved by an assumption that prosecutors will commonly invoke this statute only in cases that actually involve a forcible rape, but one that cannot be established by proof beyond a reasonable doubt.[8] That assumption implies that a State has a legitimate interest in convicting a defendant on evidence that is constitutionally insufficient. Of course, the State may create a lesser-included offense that would authorize punishment of the more guilty party, but surely the interest in obtaining convictions on in-

---

[8] According to the State of California:

"The statute is commonly employed in situations involving force, prostitution, pornography or coercion due to status relationships, and the state's interest in these situations is apparent." Brief for Respondent 3.

See also *id.*, at 23–25. The State's interest in these situations is indeed apparent and certainly sufficient to justify statutory prohibition of forcible rape, prostitution, pornography, and nonforcible, but nonetheless coerced, sexual intercourse. However, it is not at all apparent to me how this state interest can justify a statute not specifically directed to any of these offenses.

adequate proof cannot justify a statute that punishes one who is equally or less guilty than his partner.[9]

Nor do I find at all persuasive the suggestion that this discrimination is adequately justified by the desire to encourage females to inform against their male partners. Even if the concept of a wholesale informant's exemption were an acceptable enforcement device, what is the justification for defining the exempt class entirely by reference to sex rather than by reference to a more neutral criterion such as relative innocence? Indeed, if the exempt class is to be composed entirely of members of one sex, what is there to support the view that the statutory purpose will be better served by granting the informing license to females rather than to males? If a discarded male partner informs on a promiscuous female, a timely threat of prosecution might well prevent the precise harm the statute is intended to minimize.

Finally, even if my logic is faulty and there actually is some speculative basis for treating equally guilty males and females differently, I still believe that any such speculative justification would be outweighed by the paramount interest in evenhanded enforcement of the law. A rule that authorizes punishment of only one of two equally guilty wrongdoers violates the essence of the constitutional requirement that the sovereign must govern impartially.

I respectfully dissent.

---

[9] Both JUSTICE REHNQUIST and JUSTICE BLACKMUN apparently attach significance to the testimony at the preliminary hearing indicating that the petitioner struck his partner. See opinion of REHNQUIST, J., ante, at 467; opinion of BLACKMUN, J., ante, at 483–488, n. In light of the fact that the petitioner would be equally guilty of the crime charged in the complaint whether or not that testimony is true, it obviously has no bearing on the legal question presented by this case. The question is not whether "the facts . . . fit the crime," opinion of BLACKMUN, J., ante, at 487—that is a question to be answered at trial—but rather, whether the statute defining the crime fits the constitutional requirement that justice be administered in an evenhanded fashion.