OPINION OF THE COURT
Timothy J. Drury, J.
The defendant is charged with soliciting a plainclothes policeman on a street to commit oral sex with him at his apartment. He is charged with a violation of subdivision 3 of section 240.35 of the Penal Law which prohibits loitering in a public place for the purpose of engaging in or soliciting another person to engage in deviate sexual intercourse. The term deviate sexual intercourse is defined only once in the Penal Law and that is as certain types of sexual conduct between persons not married to one another (Penal Law, § 130.00, subd 2). Therefore, what is proscribed by subdivision 3 of section 240.35 of the Penal Law is loitering involving persons not married to one another.
The question presented by this case is whether subdivision 3 of section 240.35 of the Penal Law violates the equal protection clause of the Fourteenth Amendment of the United States Constitution in light of People v Onofre (51 NY2d 476, cert den 451 US 987). Onofre struck down section 130.38 of the Penal Law which prohibited persons not married to one another from engaging in deviate *404 sexual intercourse. It held that there was no rational basis to explain the different treatment accorded unmarried as opposed to married persons who engage in deviate sexual intercourse with one another. It. found that the law was unconstitutional even as it applied to persons not married to one another who engage in deviate sexual intercourse in public. (51 NY2d, at p 485.)
In a prior decision, this court ruled that subdivision 3 of section 240.35 of the Penal Law was unconstitutional in a case involving a prostitute and her customer who were engaging in oral sex in a car on a street.[1] The court held that these facts were basically the same as those in the Onofre decision and that, charging the defendant under the loitering statute, did not serve to distinguish the case in any way from the consensual sodomy statute which Onofre (supra) declared unconstitutional. At a hearing held in the instant case on the issue of the statute’s constitutionality, Officer Kenneth Burgstahler of the Buffalo Police Department Vice Squad testified that subdivision 3 of section 240.35 is used only against prostitutes and their customers and against homosexuals. The question then presented by this case is whether the statute is likewise unconstitutional as it is applied to male homosexuals.
On its face, there would seem to be no question that the statute is unconstitutional because it is obviously applied to unmarried as opposed to married persons. However, historically, according to the testimony of Captain Kenneth Kennedy of the Buffalo Police Department Vice Squad, who testified at the same hearing, the law has always been applied to male homosexuals. He testified that it is only recently, with the advent of the Onofre decision, that the law has been applied to female prostitutes and their customers in an attempt to circumvent the effect of the Onofre decision. Also, the predecessor statute to subdivision 3 of section 240.35 seemed to be directed against male homosexuals because it prohibited loitering “about any public place soliciting men for the purpose of committing a crime against nature or other lewdness” (Disorderly Conduct, former Penal Law, § 722, subd 8; see 1964 Proposed NY Penal Law, Comm Staff Notes, § 250.15, p 390). *405 And this court has not been able to find any reported cases under subdivision 8 of section 722 or subdivision 3 of section 240.35 that deal with anyone other than male homosexuals. Therefore, with this prospective, and especially in light of this court’s holding in People v Butler (110 Misc 2d 843) declaring the statute unconstitutional as applied to prostitutes and their customers, the court will treat the statute as referring only to male homosexuals. If the law then is specifically aimed at homosexuals, the fact that they are not married to one another is secondary to their being homosexuals and cannot be grounds for finding the statute unconstitutional.
The larger question as to the statute’s constitutionality remains since the statute is seeking to ban loitering to engage in what is now a constitutionally recognized and protected activity. The situation is very much unlike that in People v Smith (44 NY2d 613) where the Court of Appeals upheld the constitutionality of a law proscribing loitering for the purpose of prostitution (Penal Law, § 240.37, subd 2) which is a prohibited activity. But, as this court pointed out in People v Butler (supra) the courts of this State have prohibited loitering to perform an act which a person may have a perfect right to perform. In People v Johnson (6 NY2d 549) the Court of Appeals upheld the constitutionality of a statute which prohibits what may amount to no more than simple loitering in or about schools (Penal Law, § 240.35, subd 5) because of the possible danger this activity poses to children. From this and other cases, this court in Butler concluded that simple loitering can be legitimately banned depending on where it occurs and other circumstances. Therefore, despite the fact that persons have a lawful right to engage in deviate sexual intercourse, loitering in public for this purpose may be constitutionally proscribed depending on its effect on the public welfare. As in People v Smith there must be some connection shown between the proscription and a legitimate public concern. But, because male homosexuals are being singled out from the entire population, the People must show a strong connection between their activities and the public welfare.
*406 To determine whether such a connection exists, the court must first examine the facts of the instant case as well as the testimony derived from a hearing held to decide this issue. The court held the nonjury trial of this case after it had reserved its decision on the issue of the constitutionality of the statute at the conclusion of the hearing. Both parties had stipulated to this procedure and agreed that the court could consider the facts developed at trial as evidence also as to the issue of the constitutionality of the statute. The court has done this and reserved its decision on the question of constitutionality and, if necessary, the guilt or innocence of the defendant until now.
The facts of the case, as presented at the trial on September 24, 1981, are that, on August 7, 1981, an undercover Buffalo policeman, Steven Nicosia, was assigned to talk to suspected homosexuals and arrest them if he was propositioned in public. He was sitting on the steps of the Hotel Lenox at about 3:00 a.m. when he was approached by the defendant. The Hotel Lenox consists of apartments mainly for middle-aged and elderly people on North Street between Delaware Avenue and Irving Street in the City of Buffalo. This is a business and residential area undergoing some renewal with good quality homes and apartments close to the downtown area.
The defendant said, “Hi, how are you”. After a little bit of conversation, he asked Nicosia if he wanted to get high and Nicosia said “No”. He asked Nicosia what he liked to do and Nicosia said, “I don’t know. What do you like to do?” This went on back and forth for a minute or so. Three or four of the defendant’s friends approached and talked to the defendant. He introduced Nicosia to them. Then a police car drove up and the police told the defendant, Nicosia and the others to move on.
The defendant followed Nicosia down the street. He caught up with him and asked Nicosia if he wanted to go to his place. Nicosia asked him what he wanted to do. The defendant said, “Well, do you just want to come over?” Nicosia said, “No, I’m scared with the police. I’m going to leave”. The defendant said, “If you drive me over to my *407 place, I’ll blow you”. Nicosia arrested him at this point. The whole incident took between 10 and 15 minutes.
At the hearing held on September 24 and October 22, 1981, a local homeowner, the owner of the Lenox Hotel, the district councilman and Captain Kennedy and Officer Burgstahler testified that a number of male homosexuals would congregate on North Street between Delaware and Elmwood Avenues and, on the various street corners, soliciting companions. They testified that there was heavy automobile traffic caused by homosexuals driving through this area in response to the soliciting. Although the most the homeowner and hotel owner would say was that it made them “apprehensive”, the court finds that this soliciting in front of and near their homes and businesses significantly interfered with the use and enjoyment and worth of the property of those in the neighborhood.
Captain Kennedy testified that he received a recent complaint from a local resident that her teenage son was afraid to leave the house because he was continually solicited by groups of homosexuals on the street corners. He received another complaint from a man who said he was afraid to pass the corner of Delaware Avenue and North Street because there were so many homosexuals there that it looked like a stag line. Captain Kennedy testified that his men made many arrests, similar to the instant one, in the area where homosexuals would solicit undercover officers.
The defendant in response states that homosexuals have a right to associate with one another in public and one aspect of this right is the opportunity to make discreet inquiries of a prospective companion to have sex in private.[2] The defendant concedes that the exercise of this right can effect the rights of others in the area, but states that, since the streets are public, his right to associate with his friends is equal to those of any neighboring homeowners or businessmen.
But, from the testimony at the hearing, the court finds *408 that the offensive conduct in the area is mainly due to the activities of male prostitutes. This is not to deny that homosexuals solicit one another, and occasionally someone else, on the streets in some numbers. But it is the male prostitutes who confront passersby with frank sex talk. They are the ones who attempt to flag down cars. All of the councilman’s complaints were of the activities of male prostitutes. Also, neither the homeowner nor the owner of the hotel could recall ever hearing about anyone in the neighborhood actually having been solicited by a homosexual. Only the councilman could say that he had ever been solicited and that was by a male prostitute in the area. And, in addition, Officer Burgstahler testified that it took an average of 10 minutes of talking with a homosexual to get him to solicit him so that he could be arrested. This is hardly the picture of the aggressive male homosexual.
But the homosexuals and the male prostitutes do solicit and loiter near one another on North Street and the court finds that there is a connection between the activities of these two groups. The homosexuals came to the area first, and the male prostitutes followed to ply their trade among homosexuals who would pay for younger men. There is also some interaction between the two groups who are soliciting side by side. And although, according to Captain Kennedy, there is no great incidence of crime as a result of the activities of the male prostitutes as yet, it is only a matter of time before the robberies, assaults, and even murders that are endemic to the activities of male prostitutes elsewhere will also appear on North Street.
However, based on the testimony at the hearing, the court finds that the connection between homosexuals and male prostitutes is not the main reason that the community and the police are opposed to this type of loitering in the area.[3] The main reason is that the occasional soliciting of a teenager or others by homosexuals and the appearance of homosexuals outside homes reinforces the age-old fear *409 that people have of homosexuals and renews the offense they take at their activities. Only part of this offense is due to the fact that some of the conduct of homosexuals takes place in public.[4] And only part of the opposition people have to them is due to the economic loss to businesses and to the value of their homes that occurs when this activity takes place in an area. Some of the opposition is without foundation, but some also is grounded in the real possibility that a man or his son may be solicited, harassed or confronted at the very door to his house.
The defendant answers by stating that the same objections that the community has against homosexuals can be brought against blacks, or Spanish, or different ethnic minorities who might loiter on corners. But the court finds that the activities of homosexuals who solicit on the streets offend the public at large wherever it occurs and the objections to it are not aimed at any specific racial or ethnic group.
The defendant also argues that new laws should be drawn to meet the specific objections that he sees to be the problem, such as crowding on the streets or the street corners; but the defendant admits that he himself would have trouble drawing such a law.[5]
The court finds that homosexuals come to North Street to find a safe place to meet one another, even if it involves public soliciting. For some reason, bars and other types of meeting places, that seem to suit heterosexuals and other homosexuals, do not suffice for the homosexuals that come to North Street. There is no proof why certain homosexuals find it necessary as part of their life-style to solicit a companion on the streets, but it seems to be the case. Heterosexuals and other homosexuals do not engage in this activity so that this law cannot be viewed as discriminatory in its application.
The burden of proof is on the defendant to show that the *410 law should be found to be unconstitutional. The defendant must convince the court of this beyond a reasonable doubt.[6] The People., through their legislators, have a wide and well-recognized latitude to enact every sort of law, even stupid ones. The court finds that it cannot say that the People have failed to show beyond a reasonable doubt that a relationship exists between male homosexuals who loiter on the streets to solicit one another and a valid public purpose in prohibiting this. The court finds that a sufficient connection exists between the public’s loss of the use and enjoyment of its streets, businesses, and homes and the activity at issue to warrant this ban. The activity of homosexuals who loiter on the streets to solicit one another is akin to the loitering of prostitutes in its effect on the public (see People v Smith, 44 NY2d 613, supra), even though prostitution can readily be distinguished as an illegal activity. The defendant cannot create an ideal test tube situation and ask that his conduct be viewed apart from its surrounding social implications, nor can he blame the public for its reaction to his activities when the reaction is in large measure understandable.
For the foregoing reasons, the court denies the defendant’s motion to dismiss the charge brought against him on the grounds that subdivision 3 of section 240.35 of the Penal LaW is unconstitutional because it violates the defendant’s rights guaranteed him by the equal protection clause of the Fourteenth Amendment of the United States Constitution as well as rights guaranteed him by other sections of the United States Constitution and the companion protections of the New York State Constitution. Accordingly, having heard the evidence at trial, the court finds the defendant guilty as charged.

. People v Butler (110 Misc 2d 843).

. The defendant terms this a right of free speech and cites three States which have overturned similar laws as violative of this right (California, Pryor v Municipal Ct., 25 Cal 3d 238; Massachusetts, Commonwealth v Sefranka, _ Mass _, 414 NE2d 602; Colorado, People v Gibson, 184 Col 444).

. This conclusion is consistent with the fact that male prostitutes and homosexuals do not appear together in every location. According to Captain Kennedy, male prostitutes did not accompany the male homosexuals when the homosexuals solicited at some location on Seneca Street for many years. Also, there are no male prostitutes with the male homosexuals who are soliciting in LaSalle Park at present.

. However, the public has no way of telling the difference between a homosexual who is soliciting to take a companion back to his apartment and one who is soliciting and will commit sex in public.

. See People v Diaz (4 NY2d 469) which struck down a law which prohibited loitering because there was no stated purpose or intent set forth in the statute to specify what sort of loitering.

. People v Pagnotta (25 NY2d 333); but see Eisenstadt v Baird (405 US 438, 447, n 7); Christakos, Gender-Based Statutory Rape Legislation and the Equal Protection Clause: Michael M. v. Superior Court of Sonoma County, 101 S. Ct. 1200 (1981) (19 American Crim L Rev 99) for possible different standards.