

Ben G. Levy, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Calvin A. Hartmann and Hays Jenkins, Jr., Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

**Charles CARPENTER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 63207.**

Court of Criminal Appeals of Texas, Panel No. 2.

Sept. 15, 1982.

Rehearing Denied Oct. 13, 1982.

Before ONION, P. J., and CLINTON and TEAGUE, JJ.

OPINION

CLINTON, Judge.

Appeal is taken from a conviction for rape obtained in a trial before the court; the punishment assessed is five years confinement.

■ The sufficiency of the evidence is challenged.

Viewed in a light most favorable to the trial court's finding of guilt, the evidence establishes the seventeen year old complainant—who we will call June—called appellant, her former employer, at approximately 9:15 p.m. on the night of January 15, 1979, and asked him to give her a ride to her sister's house. Appellant picked her up in his van and drove the distance to the neighborhood where complainant's sister lived, but instead of driving to the intended destination, he drove around and ultimately pulled off the road near a park.

According to June, she had terminated her employment with appellant some four

months before because he frequently became amorous with her,[1] urging her to allow him to help her "become a woman," she having admitted to him she had more affinity for other females than men.[2] But she insisted she considered appellant to be a friend and, on the night of the offense, called him because she had no money for public transportation and none of her relatives had a car.

With the history of their relationship in mind, June attempted to exit the van once appellant stopped, but he locked it and started pulling off her pants. Though somewhat convoluted, her testimony was that she began screaming and kicking, but on realizing appellant's intent to have intercourse with her, she told him she loved him and suggested she might masturbate him to orgasm as she had once seen him do to himself. Failing through this maneuver to satisfy and thereby dissuade him, June started fighting him again. He wrestled her into the back of the van where she tried to kick out a window. Appellant finally jerked her pants down, breaking the zipper. At one point he placed his hand over her mouth, saying he could make her faint or knock her out. According to June he forced her to take his penis in her mouth. Ultimately appellant lay on her and penetrated her vagina with his penis, during which time, June testified, she was in a "state of shock" and no longer resisted.

Appellant then drove to a cafe. When he went into the restroom, June ran to her sister's house and the police were summoned. There was evidence that June sustained scratches and bruises on her shoulders and face. In addition to the condition of her pants, her panties were torn, the crotch soaked with blood. June testified she had never before had sexual intercourse.

In his own behalf, appellant testified he had had intercourse with complainant on prior occasions after the time she had quit

working for him. Appellant's description of their interaction before that time was as follows:

"She had mentioned to me about her past relationships with girls sexually, and I assumed, just like any other man would, that any time a woman approaches you about sex, that she is playing up to you, so I suggested that she would discontinue seeing girls and let me help her pull out of her desire for women by having a relationship with me. At that time she, you know, thought about it, and then we started having a relationship, the type of relationship where she would more or less get me hot. I would get hot, and we would stop at that point..."

Appellant claimed that on the night of the offense, while riding around, June had her hand in his pants and his was in hers; that her effort to masturbate him was unfruitful, and he "was pretty hot;" that her nose started bleeding from the heat in the van; that they stopped, got in the back of the van and "she had oral sex, and after that didn't work, I put my penis between her legs and she got on top of me and started real roughly putting my penis up against her vagina, moving it around like, and it slipped in for about two minutes at the most and I had reached a climax and we left." On cross-examination appellant conceded only that the complainant did at all times want to go only to her sister's house.

On appeal appellant contends the combined weight of complainant's admissions— that she told him she loved him, that she had previously told a sister he was her "boyfriend," that she had previously engaged in petting and kissing with him, that she had called him for transportation, that she had voluntarily masturbated him on the night of the offense, and that she simply "lay back" without resisting during the act of intercourse—illustrate the intercourse was with her consent, there being no evidence of "earnest resistance as might be

1. June also admitted she had kissed and "petted" with appellant on occasion.

2. On cross-examination June admitted she had once told her sister appellant was her "boy-

friend" in order to evade an impression she did not like men.

expected under the circumstances" which would "comport with human experience."

The final argument against the sufficiency of the evidence made in appellant's brief reads:

"The willing, or perhaps sometimes reluctant, participation of the prosecutrix in the sexual intercourse made the basis of the State's prosecution, is not sufficient to sustain the State's case. No matter how reluctant or passive the conduct of the prosecutrix, if she indicates by her conduct or words that she consents to the sexual intercourse, then the offense of the male is seduction, not rape. The distinction is sometimes subtle beyond comprehension, and a misjudgment may result in catastrophic consequences. It may be comforting to recall the plaintive cry of that eminent psychiatrist, Dr. Sigmund Freud:

'Despite my 30 years of research into the feminine soul, I have not yet been able to answer ... the great question that has never been answered: what does a woman want?' "

In the instant case, it is apparent that the woman involved wanted to be taken to her sister's house, as appellant conceded during his testimony. It is further apparent that through the enactments of V.T.C.A. Penal Code, §§ 21.02 [3] and 21.13,[4] the Legislature recognized that women want, and are entitled to, full control over their own persons at any given time, notwithstanding past conduct, and to be accordingly protected against assumptions such as that reported by appellant in his testimony, "that anytime a woman approaches [a man] about sex, that she is playing up to [him]."

While it might well be that under past denunciations of rape, the circumstances established here would present a difficult task for the prosecution,[5] under the 1974 Penal Code, in which the Legislature provided different proscriptions and punishment ranges for rape and the more serious aggravated form of the offense it is clear that the instant case establishes a classic example of the unaggravated form of rape which § 21.02, supra, contemplates and serves to notify all is prohibited. Indeed, it is against catastrophic misjudgments such as that made by appellant that the statute seeks to protect females. See *post* at 314.

In sum, we cannot agree with appellant that the combined weight of "admissions" by June he recounts, indicates her consent to his penetration of her female sex organ by his male sex organ.

Moreover, we think it clear appellant's awareness that his conduct—and not her consent—would accomplish his objective,[6] is reflected by his placing his hand over June's mouth, warning her he could make her faint or knock her out.

We hold the evidence presented is ample to support the trial judge's findings that appellant had sexual intercourse with June without her consent by his use of force and threats as alleged in the indictment.

This ground of error is overruled.

---

3. Proscribing unaggravated rape:

(a) A person commits an offense if he has sexual intercourse with a female not his wife without the female's consent.

(b) The intercourse is without the female's consent under one or more of the following circumstances:

(1) he compels her to submit or participate by force that overcomes such earnest resistance as might reasonably be expected under the circumstances;

(2) he compels her to submit or participate by any threat, communicated by actions, words, or deeds, that would prevent resistance by a woman of ordinary resolution, under the same or similar circumstances, because of a reasonable fear of harm; ..."

4. Prohibiting evidence of the victim's prior sexual conduct unless "and only to the extent that, the judge finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

5. Difficult, but not necessarily impossible. See *Miller v. State,* 86 S.W.2d 460 (Tex.Cr.App. 1935). See also *Killingsworth v. State,* 226 S.W.2d 456 (Tex.Cr.App.1950).

6. See §§ 6.03(a) and (b); and *Rubio v. State,* 607 S.W.2d 498 (Tex.Cr.App.1980).

By his first and second grounds of error, appellant contends § 21.02(b)(1) and (2), supra, is unconstitutional on its face as a denial of Equal Protection in that it "condemns conduct by a male but would not condemn such conduct if committed by a female." Appellant's contention is bottomed upon the Fourteenth Amendment to the Constitution of the United States. His argument concludes that the statute is not "gender neutral."

That the statute is not "gender neutral" is clear. However, as we understand it, the Federal Constitution does not require this. Recently, in *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 468–469, 101 S.Ct. 1200, 1204–1205, 67 L.Ed.2d 437 (1981), the Supreme Court of the United States had this to say:

> "In *Reed v. Reed,* [404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225] . . . the Court stated that a gender-based classification will be upheld if it bears a 'fair and substantial relationship' to legitimate state ends, while in *Craig v. Boren,* the Court restated the test to require the classification to bear a 'substantial relationship' to 'important governmental objectives.'
>
> Underlying these decisions is the principle that a legislature may not 'make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class.' But because the Equal Protection Clause does not 'demand that a statute necessarily apply equally to all persons' or require things which are different in fact. . . to be treated in law as though they were the same, this Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." [citations omitted]

Thus, the issue is whether the concededly gender based classification established by § 21.02, supra, bears a substantial relationship to ends which are legitimate concerns of State government.

In *Finley v. State,* 527 S.W.2d 553 (Tex. Cr.App.1975), this Court confronted a similar contention to that made here, but which was based on the 1972 Texas Equal Rights Amendment. See Tex.Const.Art. I § 3a. We have carefully reviewed the Court's reasoning and rejection of the contention advanced in *Finley,* supra, and find it worthy of reaffirmation. For the reasons there expressed, we find appellant's first and second grounds of error to be without merit. They are accordingly overruled.

The judgment of conviction is affirmed.

TEAGUE, J., concurs in the result.